1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                      DISTRICT OF UTAH

 3                      CENTRAL DIVISION

 4

 5   UNITED STATES OF AMERICA,     )

 6              Plaintiff,         )

 7     vs.                        )  Case No. 2:09-CR-45TS

 8   KEVIN SHUMWAY, SHARON EVETTE )

 9   SHUMWAY, and DAVID A. LACY,   )

10              Defendant.         )

11   _____)

12

13             BEFORE THE HONORABLE TED STEWART

14             --------------------------------

15                    February 23, 2010

16       Motion to Suppress, Dismiss, Bill of Particulars

17

18

19

20

21

22

23

24   REPORTED BY: Patti Walker, CSR, RPR, CP

25   350 South Main Street, #146, Salt Lake City, Utah  84101
```

```
 1                    A P P E A R A N C E S

 2

 3

 4   For Plaintiff:              Richard McKelvie, AUSA
                                 Carlie Christensen, AUSA
 5                               185 South State Street, #300
                                 Salt Lake City, Utah  84111
 6

 7

     For Kevin Shumway:          Summer Osburn
 8                               DAVID V FINLAYSON LLC
                                 43 East 400 South
 9                               Salt Lake City, Utah  84111

10

11   For Sharon Evette Shumway:  Scott Williams
                                 SCOTT C WILLIAMS LLC
12                               43 East 400 South
                                 Salt Lake City, Utah  84111
13

14   For David A. Lacy:          Matthew Lewis
                                 Matthew Cannon
15                               RAY QUINNEY & NEBEKER
                                 36 South State Street, #1400
16                               Salt Lake City, Utah  84111

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2    Witness               Examination By              PAGE

 3    Jason Caffey          Mr. McKelvie  (Direct)         9

 4                          Mr. Lewis  (Cross)            35

 5                          Mr. McKelvie  (Redirect)      56

 6                          Mr. Lewis  (Recross)          57

 7    Scott Kotlowski       Ms. Christensen  (Direct)     59

 8                          Mr. Lewis  (Cross)            87

 9    David A. Lacy         Mr. Lewis  (Direct)          103

10                          Mr. McKelvie  (Cross)        120

11                          Mr. Lewis  (Redirect)        134

12    Tyrel Lacy Saunders   Mr. Cannon  (Direct)         137

13    David Ian Lacy        Mr. Cannon  (Direct)         142

14

15    EXHIBITS RECEIVED INTO EVIDENCE:

16    Plaintiff's:

17    3                                                   33

18    2                                                   54

19    1                                                   77

20    Defendant's:

21    B                                                   46

22    C                                                   48

23    E                                                  109

24    F                                                  111

25
```

```
 1   SALT LAKE CITY, UTAH; TUESDAY; FEBRUARY 23, 2010; 9:00 A.M.
 2                       PROCEEDINGS
 3           THE COURT:  We are here today in the case of the
 4   United States of America vs. Kevin Shumway, et al.  We have
 5   representing the United States Ms. Carlie Christensen and
 6   Mr. Rich McKelvie.  On behalf of defendant Sharon Shumway,
 7   Mr. Scott Williams, on behalf of defendant Kevin Shumway,
 8   Summer Osburn, on behalf of the defendant Dave Lacy, Matt
 9   Cannon and Matt Lewis.
10           This matter was originally scheduled for oral
11   argument on two motions, a motion to dismiss and a motion
12   for a bill of particulars.  Let me first ask about the bill
13   of particulars.  That had been filed by Mr. Lacy and also
14   Ms. Shumway, and I believe a bill was filed in response to
15   that motion for Mr. Lacy; is that correct?
16           MR. McKELVIE:  That is correct, Your Honor.
17           THE COURT:  Let me ask Mr. Williams, is that bill
18   of particulars satisfactory to you or do you need something
19   additional from the government?
20           MR. WILLIAMS:  Judge, on behalf of Evette Shumway,
21   we need nothing further.  We seek no more particulars from
22   the government.  We're satisfied at this point.
23           THE COURT:  All right.
24           The motion to dismiss was also scheduled for oral
25   argument today.  Just this morning, I believe it was, or
```

1   late last night, counsel for Mr. Lacy requested that this

2   matter, the oral argument be continued, and their contention

3   was that the government filed their response to the motion

4   to dismiss just on Friday, which is several weeks late, and

5   they want the opportunity to file a response.

6          Mr. McKelvie, Ms. Christensen, I'm going to assume

7   that you are not going to oppose that request for

8   continuance, are you?

9          MS. CHRISTENSEN:  No, Your Honor.  We don't have

10   any objection to the defendants having adequate time to

11   respond.  We also believe, however, that the issues are not

12   so complex that it even requires further argument on, so we

13   would be happy to submit it on the written memoranda once a

14   reply brief is on file with the Court.

15          THE COURT:  Mr. Lewis, would you agree with that?

16          MR. LEWIS:  Yes, Your Honor.

17          THE COURT:  Would you both be willing to just

18   leave it up to the Court?  If I conclude it's necessary for

19   oral argument, we'll schedule one.  If not, we'll just make

20   the decision on the --

21          MR. LEWIS:  Yes, that's fine with us, Your Honor.

22          MS. CHRISTENSEN:  That's fine, Your Honor.

23          THE COURT:  We won't schedule anything further on

24   the motion to dismiss today.

25          That then leaves us with a motion to suppress.

    1           Mr. McKelvie, will you be handling that?

    2           MR. McKELVIE:  Your Honor, Ms. Christensen and I

    3   will both be handling that.  We have two witnesses.  I will

    4   be calling the first witness and Ms. Christensen will call

    5   the second.

    6           THE COURT:  Mr. Williams, do you have any

    7   witnesses you will be calling?

    8           MR. WILLIAMS:  Judge, I'm not part of the motion

    9   to suppress.

   10           THE COURT:  The motion to suppress -- okay.  It

   11   was filed by Mr. Lacy.  It was joined in by Kevin Shumway,

   12   so it's Ms. Osburn, then?

   13           MR. WILLIAMS:  That's correct.  I think to the

   14   extent there is an understanding to do so --

   15           MR. LEWIS:  I don't think Mr. Shumway has joined

   16   in our motion to suppress.

   17           MR. WILLIAMS:  I would doubt that --

   18           THE COURT:  I'm sorry.  You're right.  It's the

   19   motion to dismiss.  I apologize.  So the motion to suppress

   20   is only filed by Mr. Lacy.

   21           MR. WILLIAMS:  I think that --

   22           THE COURT:  So the two of you are just here as

   23   observers.

   24           MR. WILLIAMS:  Yes.  We are ornaments at this

   25   point.  I would ask to be excused -- ought to be taken down

1    for the season.

2              THE COURT:  Thank you, then.  I will not plan on

3    calling on you during the course of the cross-examination.

4              MR. WILLIAMS:  I think the only thing that hasn't

5    been spoken to is that Kevin Shumway did join with the

6    multiplicity motion, and to the extent that's going to be

7    submitted on the briefs, that's fine with Kevin Shumway too.

8              THE COURT:  You as well, Ms. Osburn?

9              MS. OSBURN:  Yes.

10             THE COURT:  You didn't join in it, did you, the

11   motion to dismiss?

12             MS. OSBURN:  Kevin has joined the motion to

13   dismiss but not the suppression motion.  We would just like

14   to join the motion to continue and file on the briefs.

15             THE COURT:  Let me -- according to my records,

16   Kevin Shumway has joined the motion to suppress, but Sharon

17   Shumway has not -- excuse me, the motion to dismiss, but

18   Sharon Shumway has not?

19             MR. WILLIAMS:  That's correct, yes.

20             MR. LEWIS:  That's the motion to dismiss, not the

21   motion to suppress.

22             THE COURT:  Let me restate it again.  The motion

23   to dismiss that was filed by Mr. Lacy has been joined in by

24   Mr. Kevin Shumway, but not by Ms. Sharon Shumway.

25             MR. WILLIAMS:  That's correct.  Judge, and just

1    for overall refreshment, Kevin Shumway is charged as a party

2    to all the counts that David Lacy is charged with.  He is

3    not charged as a principal.  So that's I think an

4    explanation as a joinder for a motion that could affect any

5    of those counts.  It would be natural if David Lacy were to

6    prevail on those, that Kevin Shumway should as well.  Sharon

7    Evette Shumway, my client, is charged as a party to Kevin

8    Shumway on two counts, those are 5 and 6, and not charged in

9    relation to David Lacy at all.

10            THE COURT:  All right.  Thank you.

11            As to the motion to suppress, Mr. Lewis, do you

12   have any witnesses that you will be calling?

13            MR. LEWIS:  We do, Your Honor.  We plan to call

14   three witnesses, Mr. Lacy, and then his son also named David

15   Lacy, and his daughter.  So we would have the three.  I plan

16   to question Mr. Lacy.  Mr. Cannon will question his son and

17   daughter.

18            THE COURT:  Thank you for that.

19            Counsel, would either of you like to impose the

20   exclusionary rule to the witnesses?

21            MR. LEWIS:  We would, Your Honor.

22            MR. McKELVIE:  We would as well, Your Honor.

23            THE COURT:  Let's just have one witness in here

24   for the government to start with.  As soon as the others are

25   gone, call your witness, Mr. McKelvie.

 1              MR. McKELVIE:  Our first witness will be Jason

 2   Caffey.

 3              Do you want us to proceed with him?

 4              THE COURT:  Yes, please.

 5                        JASON CAFFEY,

 6                Having been duly sworn, was examined

 7                    and testified as follows.

 8              THE CLERK:  If you would please state and spell

 9   your name for the Court.

10              THE WITNESS:  Jason Caffey.  J-a-s-o-n,

11   C-a-f-f-e-y.

12                     DIRECT EXAMINATION

13   BY MR. McKELVIE:

14   Q    Can you tell the Court how you are employed?

15   A    I am the national chief ranger for the Bureau of Land

16   Management.

17   Q    Chief Ranger Caffey, can you tell the Court what your

18   background and training are as a law enforcement officer,

19   specifically as a federal law enforcement --

20   A    Began federal law enforcement in 1996 with the United

21   States Border Patrol.  Five years in border patrol.  In

22   2001, I switched over to the Bureau of Land Management as a

23   law enforcement ranger.  In Wyoming, did approximately three

24   years as a law enforcement ranger, in Wyoming.  Four years

25   in Montana as the BLM ranger for that state and state staff

1    ranger title.  For about a year and a half I've been the

2    chief ranger of BLM.

3    Q    Can you describe for the Court -- you've indicated law

4    enforcement ranger.  What is the principal difference

5    between a law enforcement ranger and a ranger who may not be

6    associated directly with law enforcement?

7    A    In the BLM, we do have park rangers, we'll call them.

8    In other agencies, there are law enforcement park rangers.

9    In the BLM, we do not.  In BLM, a non-law enforcement park

10   ranger would have more recreation, public contact duties.

11   They would do emergency medical services for visitors who

12   were hurt.  They would provide information to campers.  Just

13   general public outreach.  A law enforcement ranger is a

14   federal law enforcement officer.

15   Q    In addition to having law enforcement rangers, the BLM

16   also has special agents that enforce the law; is that

17   correct?

18   A    Correct.

19   Q    You're familiar, for example, that Special Agent Dan

20   Love, who is here in the courtroom, is a BLM special agent?

21   A    Correct.

22   Q    Can you describe for the Court the primary distinctions

23   between a law enforcement ranger and a BLM special agent?

24   A    A law enforcement ranger for the BLM is a uniform

25   patrol officer.  Special agent 1811 series is a criminal

1    investigator who handles our more long-term, complex cases.

2    The authorities are the same.  However, the law enforcement

3    officer, ranger, picks up a case that is something much more

4    complex, long term, it's something that he's not going to be

5    able to investigate in a timely matter, would take him from

6    his patrol duties for a significant amount of time.  That's

7    why we have our special agents that come in and take over

8    those cases.

9    Q    Can you describe for the Court the training that you

10   have had in your capacity as a ranger and previously as a

11   border patrol agent?

12   A    In the border patrol, I did an 18-week, approximately,

13   academy through the federal law enforcement training center.

14   Then I came back through the Bureau of Land Management

15   version of FLETC -- the Federal Law Enforcement Training

16   Center.  Sorry.

17   Q    That's F-L-T --

18   A    F-L-E-T-C.  The land management training program was a

19   13-week law enforcement academy geared towards land

20   management agencies, such as BLM.

21   Q    The training that you received during that period of

22   time, does that include training in the obtaining and

23   execution of search warrants?

24   A    Yes, it does.

25   Q    Does it include training in interrogation of subjects?

1   A    Yes.

2   Q    You have described yourself as the national chief

3   ranger for the BLM.  Can you describe what that job means?

4   A    I'm the senior uniform law enforcement ranger for the

5   BLM.  I am based at our law enforcement headquarters in

6   Boise, Idaho as opposed to Washington, D.C.  We have office

7   space at the National Interagency Fire Center.  All of our

8   rangers are based in the western U.S.  I serve as a program

9   lead for the ranger program, an adviser to our director of

10  law enforcement on ranger matters.  Basically anything in

11  law enforcement that is specific to the law enforcement

12  ranger function as opposed to the special agent function, I

13  am the lead.

14  Q    So it's fair to say as far as the uniform side of law

15  enforcement that the BLM is concerned with, you are at the

16  top of the chain of command?

17  A    I do not supervise all the rangers under me, but I'm at

18  the top of that program, yes.

19  Q    Who do you report to?

20  A    The deputy director for operations in Washington, D.C.

21  Q    Now Chief Ranger Caffey, I would like to direct your

22  attention to the period of the late spring and early summer

23  of 2009, last year.  Were you working in your current

24  capacity at that time?

25  A    I was.

1   Q    In that capacity, were you advised that there was an

2   ongoing criminal investigation that was focused primarily on

3   the Four Corners region of Utah, Arizona, Colorado and New

4   Mexico?

5   A    Yes.

6   Q    How did that investigation come to your attention?

7   A    I really couldn't be specific on how the case in the

8   beginnings was fairly -- fairly quiet as an investigation.

9   Originally I would say the first time it came to my

10  attention was we knew we were going to need a fair amount of

11  manpower and there were going to be a lot of officers needed

12  to serve search warrants.  So I was involved on the fringe

13  of the planning for that.

14  Q    That would be because you're basically the number one

15  guy over that --

16  A    Correct.  That would be working with all the state

17  staff rangers, which are the lead rangers for each state,

18  for them to coordinate the necessary personnel.

19  Q    Was there a specific request for manpower around the

20  first part of June of 2009?

21  A    Yes.

22  Q    Do you recall the nature of that request?

23  A    We all converged down to the Four Corners area to serve

24  search warrants.

25  Q    What was your understanding of the basic nature of the

1   investigation that was going to culminate in the execution

2   of the search warrants?

3   A    We would have several teams of officers from the BLM

4   and the FBI serving search and arrest warrants on numerous

5   persons and residences, around the Blanding area primarily,

6   but outlying areas also.

7   Q    Were you advised of the general nature of the offenses

8   that were involved in that investigation?

9   A    Yes.  Violations of the Archeological Resource

10  Protection Act and Native American Graves Repatriation Act.

11  Q    Just for shorthand, those statutes are also referred to

12  as ARPA and NAGPRA; is that correct?

13  A    Correct.

14          THE COURT:  What are the acronyms?

15          MR. McKELVIE:  ARPA, A-R-P-A, unlike AARP, which

16  is the thing that immediately always comes to my mind

17  because I receive those envelopes all the time these days.

18  The other one is NAGPRA, N-A-G-P-R-A, Native American Graves

19  Protection and Repatriation Act.

20          THE WITNESS:  Something like that.

21  BY MR. McKELVIE:

22  Q    Now at a point in time in the first part of June, you

23  indicated that you had -- you and a number of other rangers

24  converged on Moab, Utah; is that correct?

25  A    We staged in Moab, yes.

1   Q    Can you describe what assignments you were given and

2   what assignments you gave to the people that work under you

3   as a result of that staging in Moab?

4   A    I was assigned to a team that was going to serve the

5   search and arrest warrants at David Lacy's house.  I was to

6   be Mr. Lacy's interviewer.  Another officer was the team

7   lead.  Really, by the time the search warrants were

8   beginning to come together, I didn't have -- there wasn't a

9   lot of need for direct role in assigning people.  That was

10  all up to Special Agent Love and others.

11  Q    You indicated that you were assigned to a team.  Did

12  you have a meeting with the team leader and other members of

13  the team in advance of the execution of the search warrant?

14  A    Yes.

15  Q    When and where did that meeting take place?

16  A    We had a main briefing for all people involved at

17  the -- I believe the Moab field office, the BLM office, and

18  then immediately afterward our team met in the break room in

19  the office.

20  Q    How many members were there on your team?

21  A    I don't remember, but six to eight would be my best

22  guess.

23  Q    Can you describe the makeup of those people?  What kind

24  of jobs did they do?  Who are they employed by?

25  A    There was probably half the team BLM rangers and the

1  other half FBI agents or FBI task force members.  We did

2  have two FBI employees that were evidence type people that

3  weren't sworn officers.

4  Q    Were there any BLM employees that were not sworn

5  officers?

6  A    They were the BLM archeologists, yes.

7  Q    As part of this team meeting, did you discuss the

8  logistics with respect to how the search warrant would be

9  executed and who would take over what role during the

10 execution of the search warrant and then the aftermath of

11 the initial execution?

12 A    Yes.

13 Q    What did you understand your role to be when the search

14 warrant was executed?

15 A    I had an assignment during the initial stages, which I

16 believe was something like perimeter security, something --

17 I wasn't going to knock on the door, basically.  I had

18 another role to fill.  Once we were into the residence and

19 had contacted Mr. Lacy, I was to be the primary --

20          THE COURT:  Mr. Caffey, you are speaking not only

21 too quickly, but you sometimes are difficult to understand.

22 So will you please both slow down and speak more distinctly.

23 We've got plenty of time here.  All right.

24          MR. McKELVIE:  Thank you, Your Honor.

25          THE WITNESS:  My role would have been as an

1    assisting role during the initial stages of contacting the

2    residents and afterwards.  Once we had contacted Mr. Lacy, I

3    would be his primary interviewer.

4    BY MR. McKELVIE:

5    Q    Was somebody else assigned to assist you in the

6    interview?

7    A    Yes.  Ranger Scott Kotlowski.

8    Q    Where is Ranger Kotlowski stationed normally?

9    A    Palm Springs, California.

10   Q    As part of the preparation for your role as an

11   interviewer of Mr. Lacy, were you provided any information

12   by other investigators that would assist you in the

13   parameters of that interview?

14   A    Special Agent Love gave me several topics that he

15   wanted me to ask about, fairly limited, but ask about his

16   involvements in digging in archeological areas.

17   Q    Now directing your attention to June 10th of 2007, did

18   you have occasion to go to Blanding, Utah?

19   A    Yes.

20   Q    Was that in order to execute the search warrant that

21   you have described?

22   A    Yes.

23   Q    Approximately what time -- did you travel -- first of

24   all, let me ask you did you travel together with the team

25   that you've previously described?

```
 1    A    There was one other ranger in my vehicle and then the

 2    others were in a convoy of vehicles, yes.

 3    Q    Approximately how many vehicles were involved?

 4    A    Four approximately.

 5    Q    What time of day did you embark on going to the home?

 6    What was the target in terms of execution of the search

 7    warrant?

 8    A    I don't remember the exact time, but I believe it was

 9    6:30, 6:00, 6:30 a.m. was when we wanted to be at the

10    residence.  It was about an hour drive to get there from

11    Moab.

12    Q    This was in June, correct?

13    A    Correct.

14    Q    Approximately what time did the sun come up on June

15    10th down in the Moab area -- or the Blanding area?

16    A    About the time we got there, it was daylight.  I don't

17    recall if the sun was up, but it was daylight.

18    Q    Can you describe -- first of all, let me ask you if you

19    can describe where the David Lacy residence is in relation

20    to the town of Blanding?

21    A    I would describe it as outside of town a short

22    distance, I believe off a dirt road which led to his

23    driveway, which was a dirt driveway, approximately a couple

24    hundred yards long to his house, which sat alone on a

25    hilltop.
```

1   Q    Did you and the convoy of officers arrive at that

2   house?

3   A    Yes.

4   Q    Can you describe what happened when you arrived there?

5   A    We parked our vehicles in the driveway, got out,

6   officers took their preassigned positions.  Some of the

7   officers knocked on the front door, which the way the house

8   is laid out, it's not finished, so nobody was knocking on

9   the front door.  It wasn't knocking on an inhabited part of

10  the house.  Others went around to the back door and knocked

11  on there.

12          THE COURT:  Again, Mr. Caffey, how many officers

13  were there all together at this time?

14          THE WITNESS:  Six to eight.  Possibly eight.  I

15  don't remember, Your Honor.

16  BY MR. McKELVIE:

17  Q    Were any of the vehicles that you arrived in marked

18  patrol vehicles or law enforcement vehicles?

19  A    I don't remember.  Mine was not.

20  Q    Can you tell the Court what you and others in your

21  search party were wearing that day?

22  A    Dressed essentially as I am now.

23  Q    Can you describe that for the record?

24  A    A law enforcement polo shirt, issued law enforcement

25  uniform item from the BLM, khaki trousers, black boots, my

```
 1   body armor underneath, and a black nylon duty belt.

 2   Q    So you're wearing the body armor today?

 3   A    I am.

 4   Q    It's just as conspicuous today as it would have been on

 5   that day underneath the shirt?

 6   A    Correct.

 7   Q    I know we can all see it, but just so the record will

 8   reflect it, that uniform has some kind of a -- the shirt has

 9   a law enforcement insignia; is that correct?

10   A    It has a law enforcement badge on the front and has

11   writing on the back.

12   Q    Police, U.S. Ranger on the back?

13   A    Correct.

14   Q    You are waring a gun belt or a duty belt; is that

15   correct?

16   A    Correct.

17   Q    Is that the same belt you were wearing on that day?

18   A    Yes.

19   Q    Were other BLM rangers that were involved in the

20   execution of the search warrant similarly attired?

21   A    Yes.

22   Q    What about the FBI agents?

23   A    The FBI agents were in plain clothes.  I couldn't

24   really specifically describe them, but they would have all

25   had belts on.  Probably not a duty belt like a uniform
```

1   police officer would wear such as I'm wearing, but a belt,

2   their badge, a raid jacket, something along those lines.

3   Q   You indicate that officers that were there to execute

4   the search warrant first approached the front door, and they

5   were unsuccessful in their efforts to gain the attention of

6   anybody inside the residence; is that correct?

7   A   Correct.

8   Q   Was there any attempt at that time to breach the front

9   door to enter the house without permission?

10   A   No.

11   Q   Approximately how much time transpired between that

12   time -- between the time the door was first knocked on and

13   anyone advised you or you learned in any way that entry had

14   been made into the house or someone had been contacted?

15   A   Maybe two minutes.  I didn't -- I don't have a firm

16   time, but it was a small amount of time, not long.

17   Q   You indicated that the house was under construction.

18   Can you describe in a little bit more detail the layout of

19   the house first as you approached it in the front and why it

20   is that you weren't able to contact anybody when you first

21   arrived at the residence?

22   A   From the best of my recollection, as you came up to the

23   front door, there was a porch and what would be a fairly

24   conventional front door.  There appeared to be a two-story

25   structure I believe above that.  If you were to knock on the

1   front door and go into the front through the front door, you

2   would enter the living room next to a large fireplace.  But

3   that was still under construction.  There was, I believe,

4   tools, construction materials there.  There was a stairway

5   perhaps off to your left that went up to the second story.

6       If you passed beyond the living room, I believe you

7   would go -- I think down -- must have been downstairs, the

8   kitchen, which was the finished part of the house, would

9   have been -- appeared to be a basement from the front of the

10  house.  However, if you went around to the back door, it did

11  open to a hill -- it's built on a hillside.  It was open

12  area around the back.  So there was a kitchen door around

13  back.  But most of the house I would call mostly done.  It

14  had floors and windows and doors, but not carpeting.  It was

15  still under construction.

16  Q    That part -- portion of the house did not appear to be

17  inhabited?

18  A    Correct, it did not.  The only portion that appeared

19  habitable was that downstairs.  Kitchen, it had bedrooms and

20  a bathroom I believe attached to it.  A significant part of

21  the house was downstairs.

22  Q    Through what part of the house was entry ultimately

23  obtained?

24  A    The back door through the kitchen, the habitable

25  portion.

1  Q    When did you -- when in relation to other officers did

2  you personally go around to the back and enter the home?

3  A    At some point one of the officers said they had made

4  contact with people, there was people inside, so I walked

5  around the back.

6  Q    When you got around back, can you describe the scene

7  that you saw?

8  A    There was four or five officers -- three officers,

9  something like that, clustered around the back door.  Mr.

10  Lacy was standing in the doorway, I believe just inside.

11  Q    Was that the first time you had seen Mr. Lacy?

12  A    Yes.

13  Q    Had you been given any descriptor or photograph of him

14  in order to be able to identify him?

15  A    I believe I had a photograph.

16  Q    The individual that you saw that you've described as

17  Mr. Lacy, do you see him in the courtroom today?

18  A    Yes.  He's sitting at the table in the leather jacket.

19        MR. McKELVIE:  Your Honor, may the record reflect

20  he's identified the defendant?

21        THE COURT:  The record will so reflect.

22  BY MR. McKELVIE:

23  Q    At the time you first saw Mr. Lacy, was he in contact

24  with other law enforcement officers?

25  A    Yes, they were speaking to him through the doorway.

```
 1   Q    Were they inside or outside of the house at that time?
 2   A    I don't really remember if they were inside.  It wasn't
 3   far.  I don't recall.
 4   Q    About how much time transpired between the time that
 5   you were notified that contact had been made at the rear of
 6   the house and the time that you actually came into physical
 7   contact with Mr. Lacy?
 8   A    Maybe a minute, something like that.
 9   Q    Did you actually have interaction with Mr. Lacy at that
10   time?
11   A    Yes.  When I greeted him at the doorway, I asked him if
12   he would step outside with me, and conversed with him
13   briefly.
14   Q    What was he wearing at that time?
15   A    I don't remember.
16   Q    Did you have a conversation with Mr. Lacy outside the
17   home?
18   A    Yes.  We stepped out on the porch and he asked me what
19   was going on.  He told me -- he asked me what was going on.
20   I said we had a search warrant for the house.  He said his
21   brother was the sheriff and everything was okay.  And I told
22   him what the search warrant was for, basically something
23   along those lines.
24   Q    Can you describe his general affect at that time?
25   A    I think we had just woken him up, so he was a little
```

1   confused.  But he was polite, cooperative, friendly, not

2   sure what we were there for, but other than that he was

3   fine.

4   Q    When he asked you what you were there for, I believe

5   you said that you told him that you had a search warrant for

6   his home; is that correct?

7   A    Yes.

8   Q    How did he respond to that?

9   A    I believe he said, I'll show you anything you want to

10  see and I'll tell you anything you want to know.  He was

11  very cooperative.

12  Q    At that time had you asked him any questions?

13  A    No.

14  Q    Did you describe to him the nature of the investigation

15  that had resulted in the search warrant?

16  A    I told him it was in regard to archeological crimes.

17  Q    What was his response to that, if any?

18  A    That would have been somewhere in the same time frame

19  of him offering to show us anything we wanted to see.

20  Q    What did you do and what did Mr. Lacy do after you had

21  that initial interaction and he said, I'll show you anything

22  you want to see, I'll tell you anything you want to know?

23  A    He offered to show us what was in the house.  Somewhere

24  right around that entry, I believe he needed to change

25  clothes or get dressed more appropriately.  I seem to recall

```
 1   something -- we let him do something downstairs.  To the
 2   best of my recollection it was put on clothes.  Then he took
 3   us upstairs and began to show us the house.
 4   Q    When he went downstairs to put on clothes, did he leave
 5   your physical presence for a time?
 6   A    No.
 7   Q    At this period of time, did you also have a warrant for
 8   Mr. Lacy's arrest?
 9   A    Yes.
10   Q    And as you approached the house that day, was it your
11   intention and expectation to take Mr. Lacy into custody?
12   A    Yes.
13   Q    Did that intention ever change during the course of
14   what you are going to testify about today?
15   A    No.
16   Q    When you encountered Mr. Lacy initially and told him
17   that you had a search warrant to execute his home -- or to
18   execute on his home, did you also advise him that you had an
19   arrest warrant for his arrest?
20   A    No, we just told him the search warrant.
21   Q    After he went downstairs and got dressed, you indicated
22   that he took you to a different room; is that correct?
23   A    Correct.
24   Q    Who went with him at that time?
25   A    I want to say other officers on the team had already
```

1   been into the house to secure the house before that.  I went

2   with him.  I believe Ranger Kotlowski.  There were others

3   there, but I don't know who exactly was with us at each

4   point.

5   Q    Ranger Kotlowski was the ranger that was assigned to

6   assist you in the interview; is that correct?

7   A    Correct.

8   Q    What part of the house did you go to?

9   A    He took us through that unfinished living room and up

10  the stairs.  He said everything he had was in a room

11  upstairs, and he showed us that room.  He said there were

12  pots up against the back wall, which you could see.  As soon

13  as he took us to the room and opened the door, there were

14  several -- appeared to be pots in the back and boxes.  The

15  floor was fairly cluttered.  It was hard to walk through the

16  room without stepping on things.

17  Q    Up to this point had you asked him any questions about

18  anything of a substantive nature other than his

19  identification or anything like that?

20  A    No.

21  Q    What happened after he showed you these items in the

22  room?

23  A    We asked him if there was someplace we could sit down

24  and talk that was somewhat private.  He showed us to the

25  room I think right next door but very close to upstairs,

1   another unfinished bedroom I suppose it was.

2   Q    Were there any furnishings in that room?

3   A    There either was at that time or we brought in three

4   chairs.  That was about it that I remember.

5   Q    Approximately how much time had transpired from the

6   time that you entered the home and you went into that room

7   with Mr. Lacy?

8   A    I'm going to estimate ten minutes.  It's hard to say.

9   Q    I know this is going to sound repetitive.  During that

10  entire period of time did you ask Mr. Lacy any questions

11  involving your investigation?

12  A    No.

13  Q    When you entered the room, did you begin an interview

14  with Mr. Lacy?

15  A    Yes.

16  Q    Who was present when that interview began?

17  A    Mr. Lacy and Ranger Kotlowski.

18  Q    And when you engaged in that interview with Mr. Lacy at

19  that time, did anyone advise Mr. Lacy of what we commonly

20  refer to as his Miranda rights?

21  A    Yes, Ranger Kotlowski did.

22  Q    Can you describe what you observed Ranger Kotlowski do

23  with respect to that warning?

24  A    He read his Miranda rights to him from a card.

25  Q    Did you happen to notice from where he got that card?

1   A     No.

2   Q     Do you recall, however, that he did read it from a

3   card?

4   A     Yes.  That's a fairly common practice.

5   Q     Is it a practice that you employ?

6   A     I have in the past, yes.

7   Q     Based on your training and experience and your

8   knowledge of the rights that are associated with Miranda and

9   are on that card, did it appear to you that the recitation

10  was a complete and accurate recitation of the Miranda

11  warnings?

12  A     Yes.

13  Q     At the conclusion of those warnings, what was Mr.

14  Lacy's response, if any, to having been given those

15  warnings?

16  A     He said he would tell us anything we wanted to know.

17  He was very cooperative.

18  Q     Specifically did he indicate that he understood the

19  rights that had been given to him by Ranger Kotlowski?

20  A     Yes, he did.

21  Q     Did he indicate he was willing to talk to you in light

22  of those rights?

23  A     Yes.

24  Q     Did you have an interview with him at that time?

25  A     Yes.

1  Q    Approximately how long did that interview take place?

2  A    I would have to estimate two to three hours.  It was a

3  while.

4  Q    And without going at all into any of the details or

5  content of what Mr. Lacy told you at that time, did the

6  interview primarily deal with the subject matter of the

7  investigation?

8  A    Yes.

9  Q    And at any time during the course of that interview,

10  did Mr. Lacy express to you any concern about continuing to

11  talk to you?

12  A    No.

13  Q    At any time did he request an opportunity to consult

14  with an attorney?

15  A    No.

16  Q    At any time did he ask to terminate the conversation?

17  A    No.

18  Q    During the period of time that you were conversing with

19  Mr. Lacy, was Ranger Kotlowski with you for the entirety of

20  that time?

21  A    I believe he left the room at one point at the end of

22  the interview to go get some paperwork, but other than that,

23  I believe so.

24  Q    At any time was Mr. Lacy given an opportunity to obtain

25  water or other refreshment, or take a restroom break or

1    anything of that nature?

2    A    We brought bottles of water in for all three of us.

3    And at one point I do recall he did ask for a restroom break

4    and was given one.

5    Q    You indicated that at some point in time Ranger

6    Kotlowski excused himself and went to get some paperwork.

7    Do you recall what paperwork he went to get?

8    A    I believe he went to get copies of the arrest warrant

9    as well as Miranda waiver form.

10   Q    During the course of the conversation that you had with

11   Mr. Lacy prior to Ranger Kotlowski going to get that

12   paperwork, did the topic of obtaining consent to search a

13   vehicle come up?

14   A    Yes.

15   Q    Can you describe that in greater detail for us?

16   A    I believe it was -- during the interview, he spoke of a

17   storage shed he had in town, and the keys for that storage

18   shed were on his vehicle key ring, which was in the vehicle,

19   and searching the vehicle was more a matter of getting

20   permission to go get the keys out of the truck and making

21   sure he was fine with me entering the truck to get the keys

22   out.

23   Q    Was a request made of Mr. Lacy to sign a consent form

24   to consent to the search of that vehicle?

25   A    I did not.

1  Q    You indicated that at some point Ranger Kotlowski left

2  and returned to obtain -- left to obtain some documents and

3  returned; is that correct?

4  A    Correct.

5  Q    Do you recall the documents that he returned with?

6  A    I believe he returned with the Miranda form and copies

7  of the arrest warrant.  I don't know exactly.

8         MR. McKELVIE:  Your Honor, may I approach the

9  witness?

10        THE COURT:  You may.

11        MR. McKELVIE:  I would indicate that I provided

12 previously copies of this and other proposed exhibits to

13 counsel for the defendant.

14 BY MR. McKELVIE:

15 Q    Let me show you what has been marked as Government's

16 Exhibit 3.  Do you recognize that document?

17 A    Yes.

18 Q    What do you recognize that to be?

19 A    It's our advice of rights, our Miranda form, and it

20 appears to be the one that Mr. Lacy signed.

21 Q    Was that filled out and signed in your presence?

22 A    Yes.

23 Q    There is a place on there for signatures for witnesses

24 and date and time; is that correct?

25 A    Correct.

1   Q    Those items are not filled out; is that correct?

2   A    Date is, time is not, and signature of witness is not.

3   Q    Was that filled out in your presence?

4   A    Yes.

5   Q    And just so that we're clear about this, that document

6   was prepared and signed at the conclusion of the interview

7   that you have just described; is that correct?

8   A    Yes.

9   Q    It was not presented to Mr. Lacy at the outset of the

10  interview?

11  A    That's correct.

12  Q    It wasn't presented at the time that you testified that

13  Ranger Kotlowski advised Mr. Lacy orally of his Miranda

14  rights; is that correct?

15  A    Correct.

16  Q    At the conclusion of the interview that you had with

17  Mr. Lacy and after he signed the form that you have

18  identified as Exhibit 3 --

19          MR. McKELVIE:  Your Honor, I will move for

20  admission of that exhibit at this time.

21          THE COURT:  Any objection, Mr. Lewis?

22          MR. LEWIS:  No, Your Honor.

23          THE COURT:  It will be admitted.

24          (Plaintiff's Exhibit 3 was received into

25  evidence.)

1    BY MR. McKELVIE:

2    Q    Was Mr. Lacy advised that you had a warrant for his

3    arrest?

4    A    Yes.

5    Q    Can you describe the conversation you had with him

6    about that?

7    A    I believe we showed him the warrant and told him we had

8    a warrant for his arrest.  He was surprised.  He didn't know

9    we were going to arrest him.  I believe he saw the other

10   defendant's name on the warrant, which surprised him.  We

11   explained to him he was part of the case as well.  And he

12   asked if we had to arrest him, and I told him yes because

13   the judge had commanded us to.

14   Q    Did you have any other conversation about his arrest at

15   that time?

16   A    Where he would be going, how long it would take,

17   questions along those lines.

18   Q    Were you personally involved in taking Mr. Lacy into

19   custody or transporting him?

20   A    No.  I did not transport him to the jail or the judge.

21   Q    So the matters that you have just testified to, did

22   that conclude your involvement with Mr. Lacy on that date?

23   A    I was downstairs in the parking lot when one of the

24   other officers brought him out there, but that would have

25   been the last time I saw him.  After that, there was no more

1   questioning.  There might have been some small talk in the

2   driveway for two to three minutes and that was about it.

3   Q    That small talk was not in any way related to the

4   investigation?

5   A    Correct.

6              MR. McKELVIE:  Your Honor, may I have just a

7   moment?

8              THE COURT:  You may.

9              MR. McKELVIE:  Your Honor, that's all I have for

10  Chief Ranger Caffey at this time.

11             THE COURT:  Mr. Lewis.

12                      CROSS-EXAMINATION

13  BY MR. LEWIS:

14  Q    Good morning, Ranger Caffey.  My name is Matthew Lewis.

15  I represent Mr. Lacy in this matter.

16       First, I would like to start with the team of agents

17  that arrived at Mr. Lacy's house.  I believe you testified

18  on direct that you believed it was six to eight agents but

19  you're not sure; is that correct?

20  A    I don't know the actual number, no.

21             MR. LEWIS:  Your Honor, may I approach?

22             THE COURT:  You may.  And you don't need to ask,

23  counsel.  You can go ahead and do it.

24             MR. LEWIS:  Thank you, Your Honor.

25  //

 1   BY MR. LEWIS:

 2   Q    Ranger Caffey, I'm showing you what I'm going to mark

 3   as Defense Exhibit No. 1.  Is that a document that you've

 4   seen before?

 5   A    It looks like part of the search warrant briefing.

 6            THE COURT:  Mr. Lewis, in order to distinguish

 7   your exhibits from those of the government, it will have to

 8   be marked with a letter.  So may I assume you want this to

 9   be Exhibit A?

10            MR. LEWIS:  Yes, Your Honor.

11            THE COURT:  All right.

12            MR. LEWIS:  Would Your Honor like -- well, let me

13   introduce it first.

14   BY MR. LEWIS:

15   Q    This is part of the report that was done after the

16   search was executed?

17   A    What you are going to give me is?

18   Q    The document I did give you.

19   A    Well, if it's done afterward, I wouldn't have seen it.

20   I thought this was part of the pre-briefing.  It says was,

21   past tense, so, sorry.

22   Q    Near the top there is a list of what appear to be

23   agents, FBI, BLM agents?

24   A    Uh-huh.  (Affirmative)

25   Q    Do you recognize the names that are listed there?

1    A    Part of them.

2    Q    I count 11 different agents on that list.  Did all of

3    these agents participate in the execution of the warrant on

4    June 10th?

5    A    Your Honor, the BLM people I know, I recognize the four

6    BLM rangers on the list.  The other task force members I had

7    never met before, the day before briefing, I haven't seen

8    since.  It seems about right, but I couldn't tell you who

9    their names were.

10   Q    Given this list, you have no reason to question its

11   accuracy?

12   A    No.

13   Q    But you were the team leader, so you were -- on that

14   day you were asked to supervise these various agents?

15   A    I was not the team leader.

16   Q    Were you asked to supervise the agents who were

17   on-site?

18   A    No.

19   Q    How many of the agents that arrived at Mr. Lacy's house

20   on June 10th were armed?

21   A    Well, all of the agents would have been.  There was a

22   BLM archeologist, who was a civilian.  He wouldn't have been

23   armed.  I believe the FBI had two evidence team people and

24   they weren't armed.

25   Q    So would you believe that all of the six to eight

1    people that you have testified about previously, agents,

2    would have been armed on the day in question?

3    A    Yes.

4    Q    Do you know how they were armed?  Did any of the agents

5    have automatic weapons?

6    A    Not to my knowledge.

7    Q    Any of the agent have rifles?

8    A    Yes.  I believe at least one person had a rifle out

9    when we initially contacted, but it wasn't me.

10   Q    And the other agents would have had a handgun in their

11   possession?

12   A    Yes.

13         THE COURT:  Mr. Lewis, what are you going to do

14   with your Exhibit A?

15         MR. LEWIS:  Well, I am not sure that I've laid the

16   proper foundation for it to be admitted.  It was a report

17   that was prepared listing the agents present that day.  So I

18   hoped that would refresh his recollection.  Apparently it

19   hasn't.  So I'm not going to move to admit it.

20         THE COURT:  Thank you.

21   BY MR. LEWIS:

22   Q    So going back to my question, six or seven agents --

23   or, sorry, six to eight agents had a weapon.  Was it

24   drawn -- were those weapons drawn when the warrants were

25   executed when you knocked on Mr. Lacy's door?

1   A    You know, I couldn't tell you the status of everyone's

2   weapon at every point.  There may have been weapons drawn at

3   some point.  It was a search warrant.  But when I walked

4   around to the back door, when we were contacting, I don't

5   recall anybody with a weapon in hand.

6   Q    Was your weapon drawn when you knocked on the back

7   door?

8   A    I didn't knock on the back door.

9   Q    When you knocked on the door -- I'm sorry, that's what

10  I understood.  You knocked on the door that wasn't answered;

11  is that correct?

12  A    No, other agents did.  I didn't knock on any doors.  I

13  was side security for lack of a better term.

14  Q    Did the agents that you could view at that point as

15  they were knocking on the door have their weapons drawn?

16  A    I don't recall.

17  Q    Did you have your weapon drawn?

18  A    I think I had my gun out for a moment or two when they

19  first knocked on the door, because that is typically how you

20  would serve a search warrant.  When nobody answered the

21  door, I holstered it.  Yeah, I don't believe I took it out

22  again.

23  Q    Do you know if any -- so after you knocked on the door,

24  you came around to where several agents had made contact

25  with Mr. Lacy; is that correct?

1    A    Yes.

2    Q    And did any agents enter the house with their guns

3    drawn?

4    A    Not that I recall.

5    Q    Would that be standard operating procedure when you

6    haven't secured the --

7    A    Yes, yes, that would be fine if they did.  It really

8    depends on what you encounter.

9    Q    You don't remember either way whether that happened in

10   this case?

11   A    No.  I'm sorry.

12   Q    At some point did all the agents that were present on

13   the team that day enter the home of Mr. Lacy?

14   A    At some point, yes.

15   Q    They all continued to at least carry their weapons

16   while they were there?

17   A    Yes.  Everybody would have at least had their sidearms

18   on if they had them.

19   Q    I believe you testified on direct that when you arrived

20   at Mr. Lacy's home you had both a search warrant and an

21   arrest warrant?

22   A    Correct.

23   Q    And you intended to execute both that day?

24   A    Yes.

25   Q    But when you first made contact with Mr. Lacy, you

1   didn't mention the arrest warrant; is that correct?

2   A    Correct.

3   Q    You mentioned only the search warrant?

4   A    Correct.

5   Q    And you didn't mention or tell him that you had a

6   search warrant -- or an arrest warrant until after you

7   completed his interrogation?

8   A    Correct.

9   Q    Now did you know that he had already been charged at

10  that point in an indictment?

11  A    No.  I guess I don't recall if he had been or not.  We

12  had a search warrant and an arrest warrant.

13  Q    You indicated previously you knew generally the topics

14  of the investigation, but you don't have a specific

15  recollection as to whether or not he had actually been

16  charged at that point?

17  A    I don't know.

18  Q    Did you know at that point that he was going to be

19  making an initial appearance in Moab that day on the charges

20  that were pending against him?

21  A    I believe the plan was for all the defendants to go

22  talk to a judge in Moab or Monticello.  I don't remember

23  where.

24  Q    You didn't inform him of that fact until after he had

25  been questioned -- after you had finished questioning him as

1   well, correct?

2   A    Correct.

3   Q    Now just to be clear, I understand you believe that

4   Ranger Kotlowski provided the Miranda warnings to Mr. Lacy

5   in the interrogation room before you began questioning him;

6   is that correct?

7   A    In the bedroom, yes.

8   Q    But you didn't -- you didn't make any attempt to

9   provide those warnings prior to that point; is that correct?

10   A    I'm sorry.  Could you restate?

11   Q    There are a number of minutes that intervene between

12   the time you showed up at the house and asked Mr. Lacy to

13   step outside and the time you began questioning him in the

14   room upstairs.  I just want to be clear, there was no

15   attempt to read him his Miranda rights during that beginning

16   period before you had him in the interrogation room?

17   A    That's correct.  Until he started answering questions,

18   we did not Mirandize him.

19   Q    I think you testified on direct examination that

20   Mr. Lacy was always escorted by an agent after you had made

21   contact with him?

22   A    I believe so, yes.

23   Q    So you testified that he asked to go put on some

24   clothing, correct?

25   A    Yes.

```
 1   Q    He was escorted by an agent while that was happening?

 2   A    Somebody.  A ranger or an agent, yes.

 3   Q    I'm sorry.  I'll just --

 4   A    Agent is fine.  I understand.

 5   Q    And at some point did he ask to use the restroom?

 6   A    Yes, I believe so, somewhere during the questioning.

 7   Q    And was he allowed to do so only with the door open?

 8   A    I don't recall.

 9   Q    Do you know if an agent was stationed outside the door

10   as he was using the restroom to make sure --

11   A    If the door was open or closed, yeah, somebody would

12   have been outside the door.

13   Q    Did you ever tell Mr. Lacy -- strike that question.

14        I want us to go now to the interview room and the

15   questioning that you and Ranger Kotlowski did.  You

16   testified you believe that began about ten minutes after you

17   had arrived at the Lacy residence; is that correct?

18   A    It's an approximation, but, yes.

19   Q    Do you know when you arrived at the Lacy residence?  I

20   know you said you were shooting for 6:30.  Did you make it?

21   A    We were a little late.  We had trouble finding the

22   residence.

23   Q    So you believe the interview began somewhere around

24   7:00 a.m.; is that fair to say?

25   A    Give or take.
```

```
 1   Q    And you took Mr. Lacy into a room in the upstairs
 2   portion of his house, correct?
 3   A    Correct.
 4   Q    And it was you, Agent Kotlowski and Mr. Lacy?
 5   A    Yes.
 6   Q    No one else was present in the room?
 7   A    Correct.
 8   Q    Do you remember if there was an agent stationed outside
 9   the door during that interview?
10   A    Stationed outside the door, no, I don't believe so.
11   Q    Do you have a recollection or are you just --
12   A    I know there were people working in a room nearby, but
13   I don't have any knowledge at all of somebody being told to
14   sit outside the door and guard it by any means.
15   Q    How long did that interview last?
16   A    I don't know.
17   Q    Let me --
18           THE COURT:  You previously said two to three
19   hours.
20           THE WITNESS:  That's a guess, but that's
21   approximately, Your Honor.
22   BY MR. LEWIS:
23   Q    You previously indicated that at the end of the
24   interview Mr. Lacy was provided with a written advice of
25   rights and the arrest form; is that correct?
```

1   A    Yes.

2   Q    I just want to hand you what has been marked as

3   Defendant's Exhibit B.  Is that the arrest warrant that was

4   executed on Mr. Lacy on June 10th, 2009?

5   A    It looks like it.

6   Q    Do you remember what time that arrest was executed?

7   A    No.

8   Q    But that would have been at approximately the same time

9   that the advice of rights was given to Mr. Lacy?

10  A    It would have been after the advice of rights.  But,

11  yes, pretty close.

12  Q    How soon would that have been after the conclusion of

13  the interview?

14  A    To the best of my recollection, we ended the interview

15  with the advice of rights, the written form.  I believe

16  Ranger Kotlowski left the room to go get the paperwork,

17  brought it back in, explained it again to Mr. Lacy.  He

18  signed it.  In that basic same motion of events, we gave him

19  the arrest warrant.

20          MR. LEWIS:  Your Honor, can I move the admission

21  of our Exhibit B?

22          THE COURT:  Any objection.

23          MR. McKELVIE:  No, objection, Your Honor.  It's

24  actually part of the court file.

25          MR. LEWIS:  It is, Your Honor.

```
 1            THE COURT:  It will be admitted.
 2            (Defendant's Exhibit B was received into
 3  evidence.)
 4  BY MR. LEWIS:
 5  Q    Now is it fair to say that the questioning that you did
 6  with Mr. Lacy was to substantiate the allegations, the
 7  charges that had already been made against him?
 8  A    Yes.  They were in regards to archeological resource
 9  crimes, yes.
10  Q    And you asked him about an artifact called the turkey
11  feather blanket?
12  A    I believe so, yes.
13  Q    And that's the basis of a charge that was already
14  pending against Mr. Lacy, correct?
15  A    I don't know if I could say that confidently or not.  I
16  don't know all the basics -- facts of this case.
17  Q    So is it your testimony that Agent Love simply gave you
18  a list of questions to ask and you asked those?
19  A    Yes, in general.
20  Q    Without knowing the actual charges against Mr. Lacy?
21  A    I knew it was charges against -- crimes against the
22  Archeological Resource Protection Act, but I wouldn't be
23  able to tell you exactly what items charged other than I
24  suppose the menstrual pad that he had sold.  I knew of that.
25  I don't want to speak too broadly of all the intricacies of
```

1   the investigation because I just don't know.  I wasn't part

2   of the investigation.

3   Q    Let me ask you, you testified on direct that Ranger

4   Kotlowski read Mr. Lacy his Miranda rights --

5   A    Yes.

6   Q    -- is that correct?

7        Now I would like to hand you what I've marked as

8   Exhibit C, and just ask if you recognize that document?

9   A    It looks like my report of the interview.

10            MR. LEWIS:  Your Honor, would you like copies of

11   these --

12            THE COURT:  Well --

13            MR. LEWIS:  -- referred to as --

14            THE COURT:  We just need to make certain that the

15   marked copies are given to Ms. Malley.  If you will be

16   referring to specifics from this, if you have a copy for me,

17   that would be helpful.

18            MR. LEWIS:  I will be referring to a few things.

19   BY MR. LEWIS:

20   Q    This is the report that you prepared following the

21   execution of the warrants in this case?

22   A    With the advice of rights in the back, yes.

23            MR. LEWIS:  Your Honor, I would like to move this

24   into evidence as Exhibit C.

25            THE COURT:  Any objection?

```
 1              MR. McKELVIE:  No objection, Your Honor.

 2              THE COURT:  Exhibit C will be admitted.

 3              (Defendant's Exhibit C was received into

 4    evidence.)

 5    BY MR. LEWIS:

 6    Q    How soon after the events of June 10th did you create

 7    this report?

 8    A    I started it after Mr. Lacy was taken from the house,

 9    and we finished it that night, that evening.

10    Q    On the day in question?

11    A    Yes.

12    Q    Did Ranger Kotlowski have any input into this?

13    A    Yes.

14    Q    Did he review it for accuracy and make any comments he

15    had?

16    A    Yes.  It was a collaborate effort.

17    Q    I've reviewed it, and if you need time, I would

18    obviously be happy to have you review it, but there is no

19    indication in this report that Mr. Lacy was read his Miranda

20    rights before the questioning began, is there?

21    A    You are asking would you like me to look --

22    Q    If you would like to.  I mean if you know.

23    A    On the second page, second paragraph it talks about I

24    explained to Mr. Lacy that he did not have to speak with us

25    and could also wait to answer questions with a lawyer
```

1   present.

2   Q    You will agree with me, there is no mention of the

3   Miranda warnings in that paragraph?

4   A    It says at the very bottom attached Miranda rights, but

5   see the attached waiver.

6   Q    That waiver wasn't provided at the time of the

7   questioning, it wasn't provided until after the questioning

8   was complete?

9   A    That's correct.

10   Q    There is no indication in the report here that he was

11   advised of all his Miranda rights?  I see he could wait to

12   answer questions -- he didn't have to speak with us and he

13   could wait to answer questions with a lawyer present?

14   A    That's what it says in the report, yes.

15   Q    This was prepared the day of the events in question?

16   A    Yes.

17   Q    And Ranger Kotlowski reviewed this paragraph as well?

18   A    I believe so.

19   Q    Is there a reason why you didn't have him sign the

20   advice of rights at the beginning of the interview?

21   A    We didn't have them with us.

22   Q    Did it arrive later on?

23   A    To the best of my recollection, things moved so

24   quickly, Mr. Lacy was so cooperative and willing to show us

25   everything -- we don't typically serve search warrants with,

1    you know, a file folder full of blank forms in our hand

2    because you never know what you're going to encounter.

3    Immediately he was, come in, I'll show you, let's talk about

4    it.  It didn't seem like an on opportune moment to go back

5    to the truck and get papers.

6    Q    But you planned to question him when you arrived that

7    day?

8    A    Yes.

9    Q    Now would you agree with me that your report at least

10   creates the impression that you gave this attached waiver to

11   him at the beginning?

12           MR. McKELVIE:  Objection, calls for speculation.

13           MR. LEWIS:  It's his own report, Your Honor.

14           MR. McKELVIE:  He's asking what his impression --

15   what his report would give the impression to somebody else.

16           THE COURT:  I'll sustain the objection.

17   BY MR. LEWIS:

18   Q    Your report doesn't indicate that this waiver of the

19   Miranda rights was given to Mr. Lacy after the interview was

20   concluded, correct?

21   A    That doesn't say that in that paragraph, you are

22   correct.  It does not say that he was Mirandized in the

23   written form at the end.

24   Q    So do you remember specifically advising Mr. Lacy that

25   he could terminate the interview at any time?

1   A   I remember discussing his rights with him before Ranger

2   Kotlowski read from the card.

3   Q   Do you remember advising him that he would have the

4   right to have a lawyer appointed for him if he couldn't

5   afford one?

6   A   I can't quote verbatim everything I said to him at that

7   point, but we did discuss all the Miranda rights.  That

8   being part of them, I would think I did.  I wouldn't want to

9   testify to exactly everything I said to him.

10         THE COURT:  Officer, are you testifying that you

11   discussed his Miranda rights generally before Officer

12   Kotlowski read from the card?

13         THE WITNESS:  Yes, sir.

14         THE COURT:  That's what you're saying.

15   BY MR. LEWIS:

16   Q   But you don't remember what specifically you went

17   through in that oral discussion?

18   A   No.

19   Q   If you discussed those issues, would you have expected

20   to see it in the report created that day?  Would you have

21   expected to see specific mention of those rights in the

22   report you created?

23   A   Not necessarily.  I can't put everything in the report.

24   I guess I don't understand what you are asking.

25   Q   Well, you don't have a recollection today.  I'm just

1    wondering if you had -- if you had actually done it,

2    wouldn't you expect to see it in your report that you

3    created that day?

4           MR. McKELVIE:  Your Honor, again, I'm going to

5    object to the form of the question.  What his expectations

6    are at this point is irrelevant.

7           THE COURT:  It may be not the most artfully

8    phrased question.

9           MR. LEWIS:  I will concede that.

10   BY MR. LEWIS:

11   Q    I guess I'm just asking if it's his practice to put

12   those in the reports he prepares?

13   A    Do I normally put it in the report if I Mirandize

14   people?  Yes, I would typically do that.

15   Q    Now at some point during your questioning of Mr. Lacy

16   you did ask him to consent to the search of his vehicle; is

17   that correct?

18   A    Along the lines of can we get your keys out of the

19   vehicle, yes.

20   Q    You asked him to sign a consent to search in connection

21   with that, correct?

22   A    I don't recall doing that.

23   Q    Let me show you -- I think I'm at D.  I show you what

24   has been marked as Exhibit D.  That document is labeled

25   consent to search document?

1   A     Yes.

2   Q     Having reviewed that document, does that refresh your

3   recollection as to whether you asked Mr. Lacy to sign this

4   document in connection with his consent to search?

5   A     No.  This was done -- he signed it at 8:00 a.m.  I

6   don't -- I'm sorry.  If I had him sign it, I don't remember.

7   Q     This would have been, based on your time line, at some

8   point during the questioning period of Mr. Lacy?

9   A     Correct.

10   Q     And you have no reason to doubt the validity of this

11   document, I take it?  You just have no specific

12   recollection?

13   A     I just don't remember it being done, Your Honor.

14           MR. LEWIS:  Your Honor, I assume I will wait --

15           Do you have any objection to the admission of the

16   document?

17           MR. McKELVIE:  Your Honor, just for clarification,

18   we anticipate moving for the admission of our Exhibit 2

19   through the next witness, which is the same exhibit.

20           THE COURT:  Should we just wait for that, then,

21   Mr. Lewis?

22           MR. LEWIS:  That's fine, Your Honor.

23           THE COURT:  It's up to you.  If you want to go

24   ahead --

25           MR. LEWIS:  I do have a couple of questions for

 1   Agent Caffey about it, but --

 2          MR. McKELVIE:  Your Honor, I have no objection to

 3   him cross-examining him about it as though it were admitted.

 4   I just think for continuity, we would probably like to stick

 5   with our numbering on it, but we anticipate it will be

 6   Government's Exhibit 2.

 7          THE COURT:  Why don't you just move for its

 8   admission right now, then.

 9          MR. McKELVIE:  We'll do that, then, Your Honor.

10          THE COURT:  It's the same document that you have

11   in front of you.

12          You will not object, Mr. Lewis, correct?

13          MR. LEWIS:  No.

14          THE COURT:  Exhibit 2 will be admitted, and you

15   may go ahead and cross-examine on it now.

16          (Plaintiff's Exhibit 2 was received into

17   evidence.)

18   BY MR. LEWIS:

19   Q    You noted on this document the time?

20   A    Correct.

21   Q    And not only is there a signature line that appears to

22   have a full signature, but there's also initials above that

23   time?

24   A    Yes.

25   Q    And you were previously shown the advice of rights,

1   which I believe was Government Exhibit 3?

2   A    Yes.

3   Q    And you can see that document, which was prepared the

4   same day, has no time included?

5   A    Correct.

6   Q    Do you know what other documents Mr. Lacy was provided

7   at the time the advice of rights was provided?

8   A    Other than the arrest warrant afterward, no, I don't

9   recall any.

10   Q    Would there have been other documents related to the

11   search itself, a receipt, inventory of items taken?

12   A    Most likely, but I don't believe I did those.  It would

13   have been somebody else.

14   Q    Do you know who?

15   A    No.

16   Q    You testified, I think, Ranger Kotlowski went to get

17   the forms.  Did he oversee that process to have him sign?

18   A    I don't believe so.

19   Q    You testified briefly about your experience.  How many

20   search warrants would you say you have executed previous to

21   this?

22   A    I don't know.

23   Q    Had you executed arrest warrants previously?

24   A    Yes.

25   Q    How many?

```
 1   A     I don't know.

 2   Q     Can you give us a ballpark?

 3   A     No.

 4              MR. LEWIS:  I believe I have nothing further, Your

 5   Honor.  Can I just have a moment?

 6              THE COURT:  Yes.  Go ahead.

 7              Let me ask the officer this question.  Mr. Lewis,

 8   you may want to hear it.

 9              Officer Caffey, can you explain why the consent to

10   search form would have the time on it where the Miranda

11   waiver does not?

12              THE WITNESS:  I was surprised, Your Honor.  I

13   don't know.

14              THE COURT:  Okay.

15              MR. LEWIS:  Nothing further, Your Honor.

16              THE COURT:  Mr. McKelvie, do you have additional

17   questions?

18              MR. McKELVIE:  Yes, Your Honor.

19                     REDIRECT EXAMINATION

20   BY MR. McKELVIE:

21   Q    Chief Ranger Caffey, you indicated, both during direct

22   examination and cross, that when you first encountered Mr.

23   Lacy you did not inform him that you had a warrant for his

24   arrest and you intended to arrest him that day; is that

25   correct?
```

1   A    Yes.

2   Q    Can you tell the Court why you made that decision?

3   A    As a matter of practice, I would never -- maybe not

4   never, but I very rarely would tell someone we're going to

5   arrest them until it's time to arrest them and put handcuffs

6   on them.

7   Q    Why is that?

8   A    In most cases, it would be a safety thing.  I want to

9   be -- when they know they are going to jail, if there's

10  going to be a safety consideration, that's when it's going

11  to be.  If they are going to try to fight or become

12  aggressive, it's going to be when they know they are going

13  to jail.  I want that to be under my terms.  I don't want to

14  have somebody know they are going to go to jail and sit and

15  stew and think about it for minutes or hours before I

16  actually secure them.

17              MR. McKELVIE:  That's all I have, Your Honor.

18              THE COURT:  Mr. Lewis anything?

19                      RECROSS-EXAMINATION

20  BY MR. LEWIS:

21  Q    You don't dispute that you were interrogating Mr. Lacy

22  when you had him in the room questioning him; is that

23  correct?

24  A    We were questioning him, yes.

25              MR. LEWIS:  Thank you.  Nothing further, Your

1    Honor.

2              THE COURT:  May this witness be excused, counsel?

3              MR. McKELVIE:  No objection, Your Honor.

4              MR. LEWIS:  No objection, Your Honor.

5              THE COURT:  Officer, that means that you may leave

6    the courtroom.  I would instruct you, however, please do not

7    discuss your testimony with any other witness or in the

8    presence of any other witness.

9              THE WITNESS:  I need to leave the courtroom?  I

10   can't sit in the back?

11             THE COURT:  Mr. Lewis, would you have any

12   objection to Officer Caffey staying in the courtroom?

13             MR. LEWIS:  No, Your Honor.

14             THE COURT:  You may stay.

15             THE WITNESS:  Thank you.

16             THE COURT:  Mr. McKelvie, if you would call your

17   next witness.

18             MR. McKELVIE:  Your Honor, the United States would

19   call Scott Kotlowski.

20             I apologize, Your Honor.  We thought he was just

21   outside the court.

22                       SCOTT KOTLOWSKI,

23              Having been duly sworn, was examined

24                   and testified as follows:

25             THE CLERK:  If you would please state and spell

1    your name for the Court.

2            THE WITNESS:  Scott Kotlowski.  K-o-t-l-o-w-s-k-i.

3                        DIRECT EXAMINATION

4    BY MS. CHRISTENSEN:

5    Q    Mr. Kotlowski, where are you currently employed?

6    A    I'm currently employed at the U.S. Department of the

7    Interior, Bureau of Land Management, Palm Springs, South

8    Coast field office in Palm Springs, California.

9    Q    What position do you hold with the BLM?

10   A    I'm s senior law enforcement ranger.

11           THE COURT:  Officer, would you please move forward

12   and speak into that microphone so we can all hear you?

13           THE WITNESS:  Yes, sir.

14   BY MS. CHRISTENSEN:

15   Q    What are your responsibilities as a BLM ranger?

16   A    Uniform patrol of public lands within the Palm Springs,

17   South Coast field office.

18   Q    As a BLM ranger, do you hold a law enforcement

19   commission?

20   A    Yes, I do.

21   Q    How long have you held a law enforcement commission?

22   A    With the BLM, two years.

23   Q    And prior to that did you hold a law enforcement

24   commission?

25   A    Yes, I did.

1    Q    When did you first obtain that?

2    A    2000.

3    Q    Where were you employed at that time?

4    A    I was employed with the United States Department of

5    Defense, Marine Wildlife and Environmental Law Enforcement

6    Division.

7    Q    How long were you employed by the Department of

8    Defense?

9    A    Eight years.

10   Q    So what is your combined years of experience holding a

11   law enforcement commission?

12   A    Going on about ten years now.

13   Q    What type of law enforcement training have you had

14   during the course of your career?

15   A    Graduated from the federal law enforcement training

16   center in Georgia, the U.S. Department of Defense police

17   academy, and several state and local courses.

18   Q    Have you had any specific training in the area of

19   executing search warrants?

20   A    Yes, I have.

21   Q    And what types of training have you had or who

22   sponsored that training?

23   A    First one would be the special weapons and tactic

24   school by the Hartford County sheriff's office in Hartford

25   County, Maryland, the high risk warrant entry school

1    sponsored by the Baltimore County sheriff's department, and

2    the United States Department of Defense's special weapons

3    and tactic school.

4    Q    Where were you employed when you participated in the

5    training that was sponsored by the Baltimore County

6    sheriff's office?

7    A    With the United States Department of Defense.

8    Q    Would that be true for the other training you had while

9    you were in Maryland?

10   A    That is correct.

11   Q    Have you had experience executing search warrants prior

12   to June 10th, 2009?

13   A    Yes, I have.

14   Q    Have you had experience executing arrest warrants prior

15   to that time?

16   A    Yes, I have.

17   Q    Can you describe that experience just generally?

18   A    The majority -- most of the experience is narcotics

19   warrants, military installations, along with

20   multi-jurisdictional task forces in Baltimore, Maryland.

21   Q    You are aware that in June 2009 the FBI and the BLM had

22   a joint law enforcement operation which took place in

23   southeastern Utah at that point?  Are you aware of that?

24   A    Yes, I am.

25   Q    Did you participate in that operation?

1    A    Yes, I did.

2    Q    Do you know where that operation took place?

3    A    It was in Blanding, Utah.

4    Q    When did you first learn about the operation or when

5    were you first asked to participate in the operation?

6    A    Approximately three days before the operation happened.

7    Q    What was your understanding or what were you advised as

8    to the purpose of the operation?

9    A    That it was a search and arrest warrant for an

10   individual committing ARPA violations.

11   Q    Did you have an understanding prior to that time what

12   an ARPA violation was?

13   A    Yes, I was.

14   Q    You indicated that you were currently stationed in Palm

15   Springs; is that right?

16   A    That's correct.

17   Q    So to participate in this operation, you obviously had

18   to travel to the State of Utah; is that correct?

19   A    That is correct.

20   Q    When did you make that trip?

21   A    When I got notification of it, it was that following

22   day.

23   Q    Do you recall what the date of the operation was?

24   A    I believe it was June 10th.

25   Q    So you arrived in Utah a day, two days prior to that?

1   A     The day prior.

2   Q     What did you do to prepare for that operation once you

3   arrived in Utah?

4   A     I went to a briefing at the joint BLM, FBI task force

5   command center.

6   Q     Where was that located?

7   A     Moab, Utah.

8   Q     Do you recall what day that briefing occurred?

9   A     That occurred on the 9th.

10  Q     Can you describe generally what occurred at that

11  briefing?

12  A     The general overview by the case agents.  Once the

13  briefing was over, we split up into different breakout

14  groups.

15  Q     How were those breakout groups assigned?

16  A     I do not know how they were assigned.

17  Q     What was accomplished, what was discussed during the

18  breakout group?

19  A     An overview of the paperwork and the general

20  assignments with the execution of the warrants.

21  Q     And as a result of that breakout group, what was your

22  assignment?

23  A     My initial assignment on the initial warrant entry, I

24  was a perimeter -- outside perimeter, and once the warrant

25  was completed, I was an interviewer.

1   Q    At the time of the breakout group, were you advised as

2   to whose residence you would be traveling to in order to

3   provide perimeter security?

4   A    Yes.

5   Q    What residence was that?

6   A    The residence of David Lacy.

7   Q    What other material were you given at the time of

8   either the briefing or the breakout group to help you

9   prepare for the law enforcement operation?

10  A    There was a packet with maps, pictures, and I believe a

11  copy of the search warrant.

12  Q    Was it your understanding that -- well, let me ask it

13  this way.  What was your understanding as to the purpose of

14  the operation with respect to Mr. Lacy?

15  A    That would be a search of his house and the arrest of

16  him.

17  Q    Were you provided a copy of the warrant for the search

18  of his residence?

19  A    I know there was a copy of it, but I was not provided a

20  copy.

21  Q    What about the arrest warrant?

22  A    There was a copy of the arrest warrant, but I was not

23  provided a copy of it.

24  Q    But you were aware that warrants had been obtained for

25  both the search of the residence and to arrest Mr. Lacy?

1    A    Correct.

2    Q    Now is this breakout group what we would also refer to

3    as the team?

4    A    Correct, team briefing.

5    Q    And tell me who else was on your team and what the

6    composition of that team was.

7    A    It involved members of the Bureau of Land Management

8    and the FBI.

9    Q    Were all of those individuals law enforcement officers

10   or agents?

11   A    All of them except for two individuals.

12   Q    Who were those two individuals?

13   A    One was an FBI evidence response team member, the other

14   one was a member of the BLM, archeologist.

15   Q    I'm sorry.  With respect to the FBI person, how did you

16   describe that individual?

17   A    He was a member of the evidence response team.

18   Q    Evidence response team?

19   A    Correct.

20   Q    How many other members were on that team, do you know?

21   A    I would say approximately ten to 11.

22   Q    You testified that your responsibility on that team was

23   to provide, at least initially, outside perimeter security;

24   is that right?

25   A    That's correct.

1    Q    And then, secondarily, you would serve as an

2    interviewer; is that right?

3    A    That is correct.

4    Q    Were you provided with any information about Mr. Lacy

5    prior to the time you traveled to Blanding?

6    A    I'm sorry.  Could you repeat the question?

7    Q    Were you provided with any information about Mr. Lacy

8    prior to the time that you traveled to Blanding to

9    participate in the operation?

10   A    Yes, I was.

11   Q    Do you recall what information you were given about

12   him?

13   A    I believe in the packet that was provided to us, there

14   was a complete photo of him through the DMV, and I believe

15   criminal history also.

16   Q    So from that information you would have been aware of

17   his age; is that right?

18   A    Correct.

19   Q    Did you have any information about his occupation?

20   A    No, I did not.

21   Q    Did you have any understanding as to what the criminal

22   charges were?

23   A    Yes.

24   Q    What was your understanding about that?

25   A    It was for the theft of archeological resources from

1  public lands.

2  Q    Prior to participating in the operation, were you

3  provided with any information about Mr. Lacy's residence?

4  A    Yes.

5  Q    What were you provided with respect to the residence?

6  A    There were photos of the residence along with several

7  maps showing the exact location of the residence.

8  Q    Were you provided with any information about the

9  occupants of the house?

10  A    Yes, I was.

11  Q    Do you recall what information you were given?

12  A    I believe it was -- there was Mr. Lacy and his wife,

13  and possibly several children.

14  Q    You indicated that one of your responsibilities in

15  connection with this operation would be to participate in an

16  interview of Mr. Lacy?

17  A    Correct.

18  Q    Were you given any information to help you prepare for

19  that interview?

20  A    No.

21  Q    Were you provided with any questions for the interview?

22  A    Yes, I was.

23  Q    Do you know how those questions were prepared?

24  A    I believe they were prepared by the case agent.

25  Q    Were you provided with any forms to assist you with the

1    interview?

2    A    Yes, I was.

3    Q    What forms were those?

4    A    I was provided a consent to search form and also a

5    Miranda waiver of warning.

6    Q    Were you given any other information that would help

7    you with the operation, any other forms or any other written

8    materials?

9    A    No.

10   Q    What time did you begin the operation on the morning of

11   June 10th?

12   A    We left Moab at about three o'clock in the morning.

13   Q    What time did you arrive in Blanding?

14   A    Approximately 6:30.

15   Q    How were you dressed that morning?

16   A    Dressed in the same way I am dressed today.

17   Q    I'm going to ask you to describe that for the record.

18   A    Dressed in a khaki polo shirt with a U.S. Department of

19   the Interior badge on the front, on the back side it says

20   police, U.S. Ranger, and a pair of khaki pants.

21   Q    Were you wearing any protective gear that day?

22   A    I was wearing body armor, yes, I was.

23   Q    Are you wearing that today?

24   A    No, I'm not.

25   Q    Can you indicate for the record -- you described there

```
 1    was some law enforcement identification on the back of your
 2    shirt?
 3    A    Correct.
 4    Q    What does that say?
 5    A    It says police, U.S. Ranger.
 6    Q    What size is the lettering on the back of your shirt?
 7    A    Approximately two inches tall.
 8    Q    Were you carrying any firearms that day?
 9    A    Yes, I was.
10    Q    What were you carrying that day?
11    A    I was carrying my service pistol.
12    Q    Where was that located?
13    A    On my duty belt on the left-hand side.
14    Q    Any other firearms?
15    A    At the time of the initial warrant service, I had a
16    12-gauge shotgun.
17    Q    Once you arrived in Blanding, where did you go?
18    A    Prior to going to Mr. Lacy's house, we pulled off the
19    side of the road, more or less into a parking for a
20    pre-stage.  Once we left there, we went from there to the
21    residence -- to Mr. Lacy's house.
22    Q    What took place during the pre-stage?
23    A    More or less just confirm exactly where the house was
24    at and reposition our vehicles for the initial approach to
25    the house.
```

1   Q   How long did the pre-stage take?

2   A   Approximately five minutes.

3   Q   Once that was completed, you traveled to Mr. Lacy's

4   residence; is that correct?

5   A   Correct.

6   Q   Did you have any difficulty locating it?

7   A   No, I did not.

8   Q   Were you driving a vehicle?

9   A   Yes, I was.

10   Q   Was anyone else in the vehicle with you?

11   A   Yes, there was.

12   Q   Who was that?

13   A   There was Ranger John Young and the archeologist.

14   Q   Ranger Young I take it is a BLM ranger?

15   A   That is correct.

16   Q   Do you recall the name of the archeologist?

17   A   I do not.

18   Q   What did you do once you arrived at the Lacy residence?

19   A   I went ahead and exited my vehicle and took up position

20   at the front corner panel watching the front of the house.

21   Q   Did you display a weapon at that point in time?

22   A   Yes.  I did have a shotgun in my hand.

23   Q   And your service revolver was holstered at the time?

24   A   Correct.

25   Q   How long were you stationed in front of the Lacy

1  residence?

2  A    Approximately ten minutes.

3  Q    What transpired during that period of time?

4  A    The FBI agents went ahead and knocked on the front door

5  of the residence several times with no answer, at which time

6  they decided to go to the alternate entrance, which would

7  have been on the back side of the house.

8  Q    Did you travel to the back side of the house?

9  A    No, I did not.

10  Q    Did you remain at the front of the house?

11  A    I remained at the front of the house.

12  Q    How long did you stay there after the officers went

13  around to the back of the home?

14  A    Until they made entry and cleared the house.

15  Q    How did you become aware that they had made entry?

16  A    Due to the use of radios.

17  Q    You were notified by radio?

18  A    Correct.

19  Q    Once you were notified that the house had been cleared

20  and secured, what did you do?

21  A    I went ahead and secured my shotgun and retrieved the

22  forms from my vehicle.

23  Q    When you say you secured your shotgun, what does that

24  mean?

25  A    Secured it inside of my vehicle.

1    Q    And you indicated you collected some forms from your

2    vehicle?

3    A    Correct.

4    Q    What forms did you collect at that time?

5    A    The consent to search form.

6    Q    Any other material that you took from the vehicle at

7    that time?

8    A    A notepad.

9    Q    After you collected that material, what did you do?

10   A    I went ahead and entered the residence.

11   Q    Where did you enter the residence?

12   A    Through the back door by the kitchen.

13   Q    As you entered the residence from the back door, can

14   you describe what you observed as you entered the residence?

15   A    When I came through the residence, it goes right into

16   the kitchen area, there were several team members up there

17   along with Mr. Lacy.

18   Q    When you entered the home, did you recognize Mr. Lacy?

19   A    Yes, I did.

20   Q    Was that based upon the photograph?

21   A    Correct.

22   Q    Do you recall how many team members were there as you

23   entered the home?

24   A    I do not recall at that time.

25   Q    Do you recall how Mr. Lacy was dressed when you entered

1   the home?

2   A    He was fully dressed in clothes.

3   Q    Do you know if he had been given an opportunity to

4   change his clothes before you arrived in the home?

5   A    I don't know if he did or not.

6   Q    Was anyone else present besides the team members and

7   Mr. Lacy when you entered the home?

8   A    I believe seeing a female also present.

9   Q    Did you have any information as to the identity of the

10  female?

11  A    No, I did not.

12  Q    Were there any other residents in the home?

13  A    Not that I could tell.

14  Q    Did you have any interaction with the female?

15  A    No, I did not.

16  Q    At the time you arrived, had Mr. Lacy already been

17  advised as to the purpose of the entering into his

18  residence?

19  A    I believe he has.

20  Q    You don't recall hearing that explanation given to him

21  after you entered the home?

22  A    No, I do not.

23  Q    Do you know whether Mr. Lacy had been advised as to the

24  existence of an arrest warrant for him?

25  A    No, I don't.

1   Q    Did Mr. Lacy say anything to you when you entered the

2   residence?

3   A    No, he did not.

4   Q    Did you say anything to him?

5   A    I did not.

6   Q    What happened then after you entered the residence?

7   A    Once I entered the residence, myself and Chief Ranger

8   Caffey made our way to Mr. Lacy.  Chief Ranger Caffey talked

9   to him, and pretty much Mr. Lacy said that he would be more

10  than happy to show us his collection of artifacts.

11  Q    Do you know what Ranger Caffey said to Mr. Lacy?

12  A    I do not recall.

13  Q    And Mr. Lacy indicated that he would be willing to show

14  you his artifacts?

15  A    Correct.

16  Q    Did you ask him any questions at that time?

17  A    I did not.

18  Q    Did Mr. Lacy then proceed to show you what he had?

19  A    Mr. Lacy did.

20  Q    Tell me what transpired.

21  A    Mr. Lacy took us upstairs to a room on the upstairs

22  floor.  He opened the door and said, these are all the

23  artifacts.

24  Q    What was in that room?

25  A    There were several large pots along with several

1    display cases with different types of arrowheads.

2    Q    How would you describe that room other than what the

3    contents of it were?

4    A    It looked like a small storage room.

5    Q    How much time did you spend looking into that room?

6    A    About five to ten minutes.

7    Q    Did you ask Mr. Lacy any questions about the contents

8    of the room?

9    A    I did not.

10   Q    Did Ranger Caffey ask him any questions about the

11   contents of the room?

12   A    I don't recall if he did.

13   Q    What happened after you completed your observations of

14   that room?

15   A    We went ahead and we left that room and we went to an

16   adjoining room just right down the hall so we could talk.

17   Q    How did that come about?

18   A    I believe Ranger Caffey asked him would you like to

19   talk about all this, and Mr. Lacy said yes.

20   Q    So you went with Mr. Lacy and Ranger Caffey to another

21   room?

22   A    Correct.

23   Q    Did anybody else go with you?

24   A    It was just us three.

25   Q    What was in the room that you went to?

1   A    It looks like a room that was still under construction.

2   There were a couple of chairs and like a couple of ladders

3   and some power tools.

4   Q    Do you recall what time you entered this room?

5   A    I would say about between 7:15 and 7:20.

6   Q    What took place once you moved into this adjacent room?

7   A    Once we set the chairs up, we got some introductions --

8   more introductions out of the way, I did advise Mr. Lacy of

9   his Miranda rights.

10  Q    Did you do that from memory?

11  A    No, I did not.

12  Q    How did you do it?

13  A    I utilized a card that was provided by the federal law

14  enforcement training center.

15  Q    Did you read from that card?

16  A    Yes, I did.

17  Q    Let me show you what's been marked as Government's

18  Exhibit No. 1.  I will ask you, do you recognize that

19  document?

20  A    Yes, I do.

21  Q    How do you recognize that document?

22  A    That is a copy of my advisement of rights card.

23  Q    And is this the same card you read from when you

24  interviewed Mr. Lacy?

25  A    Yes.

1          MS. CHRISTENSEN:  Your Honor, I would move for the

2     admission of Government Exhibit No. 1.

3          THE COURT:  Any objection?

4          MR. LEWIS:  No, Your Honor.

5          THE COURT:  It will be admitted.

6          (Plaintiff's Exhibit 1 was received into

7     evidence.)

8     BY MS. CHRISTENSEN:

9     Q    In looking at this document, Ranger Kotlowski, it looks

10    to me like there are several paragraphs or several sections

11    on the card.  Can you identify specifically what information

12    from that card you conveyed to Mr. Lacy?

13    A    The warning section and the waiver section.

14          MS. CHRISTENSEN:  Your Honor, if you don't mind,

15    I'm going to ask him to read that into the record.

16          THE COURT:  That's fine.

17          THE WITNESS:  Under the warning section, you have

18    the right to remain silent.  Anything you say can be used

19    against you in court.  You have the right to consult with an

20    attorney and to have them present during questioning.  If

21    you cannot afford an attorney, one will be appointed to

22    represent you prior to questioning.

23          THE COURT:  Officer, will you slow down -- when

24    you start reading, you go too fast -- so the court reporter

25    can get everything you are saying.

1          THE WITNESS:  Okay.

2          THE COURT:  Did you read everything you intended

3   to read?

4          THE WITNESS:  For the warning, then I went to the

5   waiver section and I asked Mr. Lacy if you understand your

6   rights and are you willing to waive these rights and talk.

7   BY MS. CHRISTENSEN:

8   Q    Do you recall what Mr. Lacy's response was?

9   A    He said he would like to talk to us.

10  Q    Did he ask any questions about the information you had

11  read to him?

12  A    No, he did not.

13  Q    Did he ask to speak with an attorney?

14  A    No, he did not.

15  Q    Did he express any hesitancy or concern about answering

16  questions?

17  A    No, he did not.

18  Q    At that time did you ask Mr. Lacy to sign a form

19  confirming that he had waived his rights?

20  A    No, I did not.

21  Q    Why not?

22  A    I did not have the form with me.

23  Q    Did Mr. Lacy eventually sign a form confirming that he

24  had waived his rights?

25  A    Yes, he did.

1    Q    When did that occur?

2    A    At the end of the interview.

3    Q    Were you involved in obtaining his signature on that?

4    A    Yes, I was.

5    Q    Ranger Kotlowski, I'm going to ask you to look at

6    what's been admitted now as Government Exhibit No. 3.  Do

7    you have that document before you?

8    A    Yes, I do.

9    Q    Do you recognize that document?

10   A    Yes, I do.

11   Q    How do you recognize that?

12   A    That's the advice of rights that Mr. Lacy signed.

13   Q    Do you know whose signature is on that form on the

14   right-hand bottom corner of that document?

15   A    Mr. Lacy's.

16   Q    How do you know that's Mr. Lacy's signature?

17   A    He signed it in front of me.

18   Q    There is also a blank line to the left of his signature

19   that's identified as the signature of witness.  Do you see

20   that?

21   A    Yes.

22   Q    There is not any signature on that document next to

23   that line; is that correct?

24   A    That is correct.

25   Q    Do you know why there is no signature there?

1    A    I forgot to put my signature there.

2    Q    Was Ranger Caffey present at the time that Mr. Lacy

3    signed this document?

4    A    Yes, he was.

5    Q    During the course of your interview, did Mr. Lacy give

6    consent for any other law enforcement action while you were

7    interviewing him?

8    A    Mr. Lacy consented to a search of his vehicle.

9    Q    Let me have you look at what's been marked and admitted

10   as Government Exhibit 2.  Do you have that document in front

11   of you?

12   A    I have Exhibit B.

13   Q    Now do you have that document in front of you?

14   A    Yes, I do.

15   Q    Do you recognize that document?

16   A    Yes, I do.

17   Q    How do you recognize this one?

18   A    It's the consent to search of Mr. Lacy's vehicle.

19   Q    Can you tell me what the purpose of this document was?

20   A    This is a consent to search of Mr. Lacy's vehicle.  He

21   stated there was a possibility of some digging tools in the

22   vehicle at the time of the interview.

23   Q    I take it that you sought his consent to search the

24   vehicle for those tools?

25   A    That's correct.

1   Q    At what point in the interview was his consent to

2   search the vehicle obtained?

3   A    I believe it was about halfway through.

4   Q    If you will notice on Exhibit 2, there is a time

5   recorded there next to the signature.  Do you see that?

6   A    Yes, I do.

7   Q    Does that help you place at what point in time in the

8   interview that this consent to search was obtained?

9   A    Yes.

10   Q    How far into the interview would that have been?

11   A    Probably a little bit before half.

12   Q    And would you confirm for me whose signature it was on

13   that document?

14   A    Mr. Lacy's.

15   Q    How do you know that?

16   A    Because he signed it in front of me.

17   Q    Again, that document does not appear to be witnessed;

18   is that correct?

19   A    That is correct.

20   Q    Why is that?

21   A    I did not put my signature on that.

22   Q    But you do recall seeing Mr. Lacy sign that document?

23   A    Correct.

24   Q    How long did your interview of Mr. Lacy last?

25   A    Approximately maybe two hours.

1   Q    Were you present the entire time?

2   A    No, I was not.

3   Q    Why not?

4   A    I left to deliver the consent to search form to the

5   team leader and retrieved the Miranda -- or rights of advice

6   from my vehicle.

7   Q    And as we've talked, Government Exhibit 2 indicates

8   that it has an entry of 8:08 a.m.  Would that have been the

9   approximate time that you left the interview?

10  A    Yes, just a little bit after that.

11  Q    And you took what has been marked as Exhibit 2 to the

12  search team; is that correct?

13  A    Correct.

14  Q    What else did you do at the time you left the interview

15  room?

16  A    I went to my patrol vehicle and retrieved the consent

17  to -- the Miranda waiver.

18  Q    What did you do after you delivered the consent to

19  search and had retrieved the Miranda waiver from your

20  vehicle?

21  A    I returned back to the interview.

22  Q    How long were you gone from the interview?

23  A    No more than 15 minutes.

24  Q    Did anyone else enter the interview room during the

25  course of the interview?

1   A    Not while I was there.

2   Q    Did you take any notes of the interview?

3   A    Yes, I did.

4   Q    Do you know whether Ranger Caffey took any notes of the

5   interview?

6   A    I believe he did also.

7   Q    During the course of the interview, did Mr. Lacy ever

8   request the opportunity to consult with an attorney?

9   A    No, he did not.

10   Q    Did he ever ask that you stop the interview?

11   A    No, he did not.

12   Q    Did he ever express any hesitancy or concern about

13   proceeding with the interview?

14   A    No, he did not.

15   Q    Did he ever request the opportunity to use the

16   restroom?

17   A    Yes, he did.

18   Q    Was that request granted?

19   A    Yes, it was.

20   Q    How was that accomplished?

21   A    Mr. Lacy was escorted down to the lower level to

22   utilize the bathroom.

23   Q    Did you escort him or did someone else do that?

24   A    I escorted him.

25   Q    Did Mr. Lacy ever request the opportunity to get

1    something to eat or have something to drink during the

2    course of the interview?

3    A    Not that I recall.

4    Q    Did Mr. Lacy ever request to have a family member

5    present during the course of the interview?

6    A    No, he did not.

7    Q    Did you or Ranger Caffey ever threaten Mr. Lacy during

8    the course of the interview?

9    A    No, we did not.

10   Q    Did you ever physically restrain Mr. Lacy in any way?

11   A    No, we did not.

12   Q    Did you ever display your weapon during the course of

13   the interview?

14   A    No.

15   Q    Did you make any promises to Mr. Lacy?

16   A    No, I didn't.

17   Q    Did you summarize your interview with Mr. Lacy at its

18   conclusion?

19   A    Yes, I did.

20   Q    How did he respond to that?

21   A    He agreed with it.

22   Q    Did you notify Mr. Lacy that he was under arrest?

23   A    No, I did not.

24   Q    Did Ranger Caffey do that?

25   A    I believe he did.

1  Q    Were you present when that took place?

2  A    Yes, I was.

3  Q    Can you tell me -- or can you describe what happened at

4  that time?

5  A    We left the interview, I went downstairs and Mr. Lacy

6  was placed under arrest.

7  Q    What was his response to that?

8  A    A little shocked.

9  Q    Was he upset?

10  A    Not that I could tell.

11  Q    Did you participate any further in the arrest of Mr.

12  Lacy?

13  A    Yes, I did.

14  Q    What was your role at that point?

15  A    I assisted the FBI agent with the transportation of Mr.

16  Lacy.

17  Q    Where was Mr. Lacy transported to?

18  A    To U.S. Marshals' custody in Monticello.

19  Q    Did you subsequently prepare a written report of the

20  interview?

21  A    Yes, I did.

22  Q    Can you tell me what you did to prepare a written

23  report, what steps you took?

24  A    Myself and Ranger Caffey prepared a joint record of

25  interview.

1    Q    Where was that work accomplished?

2    A    Ranger Caffey started in the kitchen area of Mr. Lacy's

3    house and it was concluded at the command center.

4    Q    When you say the command center, what location is that?

5    A    That was in Moab.

6    Q    So how much time transpired between the time that you

7    finished the operation in Blanding and the time that that

8    report was completed?

9    A    The report was completed before anybody left the

10   command center.

11   Q    That would have been, what, the same day that the

12   operation took place?

13   A    That's correct.

14   Q    What process or what steps did you and Ranger Caffey

15   take to complete the written report?  Did you work on the

16   document together?  Did he do an initial draft and then you

17   edited it?  Tell me what the process was for completing the

18   written report.

19   A    We both worked on it.  He did do an initial draft, and

20   then I went ahead and reviewed it also.

21   Q    Do you have Exhibit C there in front of you?

22   A    Yes, I do.

23   Q    Do you recognize that document?

24   A    Yes, I do.

25   Q    What is that document?

1  A    That is the report of interview from Chief Ranger

2  Caffey and myself.

3  Q    And to the best of your recollection, does that reflect

4  the events that took place on January 10th?

5  A    Yes.  On June 10th, yes, correct.

6         MS. CHRISTENSEN:  If I might have a moment, Your

7  Honor?

8         THE COURT:  Go ahead.

9         MS. CHRISTENSEN:  Nothing further.

10         THE COURT:  All right.

11         Mr. Lewis, how long do you expect your cross to

12  be?

13         MR. LEWIS:  I think it will be shorter than Ranger

14  Caffey, about half an hour.

15         THE COURT:  We'll go ahead and take a ten-minute

16  recess now then.

17         (Recess)

18         THE COURT:  Go ahead, Mr. Lewis.

19         MR. LEWIS:  Thank you, Your Honor.

20                      CROSS-EXAMINATION

21  BY MR. LEWIS:

22  Q    Good morning, Agent Kotlowski.

23  A    Good morning.

24  Q    My name is Matthew Lewis.  I represent Mr. Lacy in this

25  matter.

1       You testified on direct examination that you believed

2   there were 11 agents that executed the warrant at Mr. Lacy's

3   address on June 10th; is that correct?

4   A    I believe so.

5   Q    And I believe, if I understood your testimony on direct

6   examination, you thought at least nine of those agents were

7   armed with weapons?

8   A    I know all of them except for two of them were armed.

9   Q    So if there were 11 agents, then nine would have been

10  armed?

11  A    Correct.

12  Q    You testified that you had a shotgun at the time that

13  the agents approached Mr. Lacy's residence; is that correct?

14  A    Yes, I was armed with a shotgun.

15  Q    Did any other agents have shotguns or rifles?

16  A    I believe there were a few other agents who had rifles.

17  I don't remember.

18  Q    More than two?

19  A    I don't remember.

20  Q    And do you know if those rifles were visible to Mr.

21  Lacy as he opened the door on that morning?

22       MS. CHRISTENSEN:  Objection, lacks foundation,

23  calls for speculation.

24       MR. LEWIS:  I just asked him if he knows.  He

25  testified --

1          THE COURT:  I will overrule the objection.  He may

2     answer the question.

3          THE WITNESS:  No, I do not.  I was not at the door

4     Mr. Lacy opened.

5     BY MR. LEWIS:

6     Q    You testified previously you believed his wife -- Mr.

7     Lacy's wife was in the house when the warrant was executed.

8     Was there also a child in the house at that time?

9     A    All I had seen was a female in the house.

10    Q    Now do you know if the agents who were at or near the

11    door that Mr. Lacy eventually opened had their weapons drawn

12    when he opened the door?

13    A    I would not know that.

14    Q    Because you were on a different side of the house?

15    A    I was on the front side of the house.

16    Q    Do you know if any of the officers or agents that were

17    part of the team, if they entered Mr. Lacy's house with

18    their guns drawn?

19    A    I would not know that.  I was at the front of the

20    house.

21    Q    Had they already entered the house by the time you came

22    around to the side where Mr. Lacy had answered the door?

23    A    When I entered -- when I entered the house, they had

24    already made entry and cleared the house.

25    Q    Did any agents have their guns drawn at that point.

1    A    Not that I seen.

2    Q    How many agents or rangers entered Mr. Lacy's home that

3    day, do you know?

4    A    I do not know.

5    Q    How many agents did you see at the home?

6    A    Once the house was secured, the entire team was in the

7    house.

8    Q    All 11 agents at some point would have been in Mr.

9    Lacy's home?

10   A    Approximately 11.  I cannot remember the actual amount

11   of agents that was there.

12   Q    When you arrived at Mr. Lacy's home on June 10th, you

13   knew there had been an arrest warrant that had been issued

14   for Mr. Lacy; is that correct?

15   A    That's correct.

16   Q    Part of the plan that day was to execute that arrest

17   warrant as well as the search warrant; is that correct?

18   A    Don't know about the arrest warrant until later.  I

19   knew we were serving a search warrant.

20   Q    What point did you learn about the arrest warrant?

21   A    I knew there had been an arrest warrant issued.  It was

22   in the paperwork at the briefing.  Whether or not the

23   execution of that arrest warrant was going to happen that

24   day, I could not tell.  That would have been up to the team

25   leader.

1  Q    Now did you know at that point that Mr. Lacy had

2  already been charged in an indictment with several federal

3  felonies?

4  A    Yes.

5  Q    Was that indictment also part of the briefing materials

6  that you received?

7  A    There was a list of charges on the actual arrest

8  warrant.

9  Q    Now you previously testified that you reviewed Exhibit

10  C, the report prepared by Officer Caffey and you jointly,

11  correct?

12  A    Correct.

13  Q    If I could direct your attention -- and you reviewed

14  this document as it was being prepared and you were able to

15  provide any changes that you wanted to make?

16  A    I'm sorry.  Could you repeat the question?

17  Q    Did you review the document as it was being prepared?

18  A    Portions of it, yes.

19  Q    And you had a chance to provide edits or make any

20  changes that you wanted to make?

21  A    Correct.

22  Q    In the first paragraph under details, it states, on

23  June 10th, 2009, BLM Ranger Scott Kotlowski and I

24  interviewed David Lacy at his residence in conjunction with

25  search and arrest warrants that were being served by an

1   interagency team of officers.  Do you remember reviewing

2   that provision?

3   A    Yes, I did review it.

4   Q    You believe it's accurate?

5   A    Yes.

6   Q    Now do you know if Mr. Lacy was informed that an arrest

7   warrant existed at the time he was initially contacted?

8   A    No, I would not know that.

9   Q    To your knowledge when is the first time Mr. Lacy

10  became aware there are was a warrant for his arrest?

11  A    At the conclusion of the interview.

12  Q    Did you make him aware of that fact?

13  A    I can't remember if I did or -- but I believe somebody

14  else did.

15  Q    Can I turn your reference to Exhibit B there in front

16  of you.  Is that the warrant for arrest that was provided to

17  Mr. Lacy on June 10th, 2009?

18  A    Correct.

19  Q    That is your signature at the bottom of the warrant?

20  A    That's correct.

21  Q    Do you know what time he was served with the warrant

22  for arrest?

23  A    That would have been after the interview.  I cannot

24  recall the actual time.

25  Q    Was it at approximately or the same time that he was

```
 1   given the advice of rights and asked to sign that document
 2   that's been marked as Exhibit 3 -- Government Exhibit 3?
 3   A    Can you repeat that question?
 4   Q    Was he given -- I'm trying to establish if he was given
 5   the warrant for arrest at approximately the same time he was
 6   asked to sign this advice of rights form.
 7   A    The arrest warrant I believe was given to him after the
 8   advice of rights was signed.
 9   Q    But the advice of rights was given to him after the
10   interview was completed; is that correct?
11   A    The signed one is, but he was also advised of his
12   rights at the beginning the interview.
13   Q    I understand that.  I'm talking about the document
14   itself, it was provided to him after the completion of the
15   interview, correct?
16   A    Correct.
17   Q    That's approximately the same time that he was provided
18   with the warrant for arrest?
19   A    A little bit after he got -- I believe he got the other
20   warrant also.
21   Q    But in the same general time period?
22   A    Pretty much.
23   Q    When you served the warrant for arrest on Mr. Lacy, did
24   you indicate that -- did you discuss the nature of the
25   charges against him?
```

1    A    I let him know what the warrant said.

2    Q    And did you inform him that he had already been charged

3    for certain crimes?

4    A    I don't remember telling him that.

5    Q    That was after the conclusion of the interview?

6    A    Correct.

7    Q    At what point did you advise Mr. Lacy that he was

8    scheduled to make an initial appearance that day in Moab?

9    A    I don't recall informing him of that.

10   Q    You didn't ever inform him of that?

11   A    I do not recall.

12   Q    You were part of the transportation team, is that what

13   you testified?

14   A    I was assisting the FBI agent.  He was the primary

15   transport officer.

16   Q    So what was the transportation plan for Mr. Lacy?  I

17   think you testified he was taken to Monticello?

18   A    He was taken to the U.S. Marshals' command center that

19   they had set up there in Monticello.

20   Q    Do you know what the plan was for Mr. Lacy after he was

21   delivered to the marshals?

22   A    No, I do not.

23   Q    You don't know whether he was scheduled to appear in

24   court that day?

25   A    No, I do not.

1   Q    After agents entered Mr. Lacy's home, is it fair to say

2   that he was constantly escorted by at least one agent or

3   ranger while he was in the home?

4   A    Correct.

5   Q    You testified that you -- I can't remember if you

6   testified.  Did you testify that he changed his clothes at

7   some point?

8   A    He was dressed when I entered the house.

9   Q    So you are not aware of him asking to change clothes at

10  some point?

11  A    No.

12  Q    You testified that he did at some point ask to use the

13  bathroom during the interview?

14  A    Correct.

15  Q    Was he required to leave the door open while he did

16  that?

17  A    I don't believe he was required to leave the door open.

18  Q    Were you the agent or ranger that accompanied Mr. Lacy

19  during that time?

20  A    I believe I was.

21  Q    Were you stationed just outside the door?

22  A    Just outside the door.

23  Q    Was Mr. Lacy ever advised that he could leave the house

24  while you executed the warrant?

25  A    I do not recall that.

1   Q    Let me ask you about the interview itself.  You

2   testified you thought it began at approximately 7:15?

3   A    Approximately about that time.

4   Q    And you thought it went for about two hours; is that

5   correct?

6   A    About that.

7   Q    So you believe the interview was over by 9:15 in the

8   morning?

9   A    I would say that, but I don't have the exact time when

10  it was concluded.

11  Q    Is that your best recollection?

12  A    Thereabouts.

13  Q    What time was Mr. Lacy transported, do you remember?

14  A    No, I do not.

15  Q    How long before -- how long between the time the

16  interview ended and the time that Mr. Lacy was transported

17  from the house?

18  A    I would say about half hour, 45 minutes approximately.

19  Q    So you think that by ten o'clock he was being

20  transported out of the house?

21  A    I don't have the actual times.

22  Q    I'm just going off your time.  The interviews begin at

23  7:15, ends two hours later, and he's out of the house 45

24  minutes after that.  That's ten o'clock, right?

25  A    Correct.

1   Q    The interview with Mr. Lacy took place in an upstairs

2   bedroom; is that correct?

3   A    It was an upstairs room.

4   Q    It was empty at the time?

5   A    There was some construction debris where he was

6   remodeling.

7   Q    Were chairs brought into that room for the purposes of

8   questioning Mr. Lacy?

9   A    I believe one or two chairs were.

10  Q    Was there already -- I assume there were three people

11  in the room, so there was already a chair present?

12  A    I believe there was.

13  Q    And was the purpose of that interview to question Mr.

14  Lacy about the charges that were pending against him?

15  A    Yes, it was.

16  Q    Is it fair to say it was an interrogation?

17  A    I wouldn't say it was an interrogation.  I would say it

18  was an interview.

19  Q    But in your mind it lasted at least two hours, correct?

20  A    About that.

21  Q    During that time was Mr. Lacy given any breaks to leave

22  the room?

23  A    He said he needed to go to the bathroom and we

24  accommodated him by taking him to the bathroom.

25  Q    Is that the only break?

1  A    That's the only one he asked for.

2  Q    Was he advised that any family members were trying to

3  reach him?

4  A    I was not advised of that.

5  Q    But you were in the interview for the entire time

6  except for 15 minutes, as I understood your testimony,

7  correct?

8  A    Correct.

9  Q    At any time while you were present, was Mr. Lacy

10  advised of the fact that family members were trying to reach

11  him or contact him?

12  A    Not by me.

13  Q    Not by anyone else in your presence?

14  A    I would not know that.

15  Q    You were there.  I mean did you hear, for example,

16  Ranger Caffey say, someone in your family is trying to reach

17  you to discuss -- to contact you?

18  A    I don't recall that.

19  Q    Now you reviewed the report prepared by Agent Caffey --

20  I call it prepared by him because it's got his name on it,

21  but you prepared that report jointly; is that correct?

22  A    Correct.

23  Q    As you sit here today do you feel like it's accurate?

24  A    Correct.

25  Q    Now I don't know if you've had a chance to review that

1    report, but would you agree with me that the report makes no

2    mention of you reading Miranda rights from a card?

3    A    No, it does not.

4    Q    I think you also testified that when you arrived to

5    execute the warrants on the date in question, that you had

6    been given forms; is that correct?

7    A    Correct.

8    Q    One of those was a consent to search form; is that

9    correct?

10   A    Correct.

11   Q    And one of those was the advice of rights form?

12   A    Correct.

13   Q    And you knew at least the plan, once the warrants were

14   executed, was to question Mr. Lacy about the charges against

15   him?

16   A    Correct.  We were going to ask him if he would like to

17   talk.

18   Q    But you simply didn't bring the advice of rights form

19   into the house?

20   A    Yeah, I forgot it.

21   Q    And is it common that you would have someone sign an

22   advice of rights form after you have completed all the

23   questioning of them?

24   A    It's not common, and it's not common for me.  Normally

25   I have them sign the form ahead of time.  Unfortunately, I

1    left the form in the vehicle.

2    Q    You could have retrieved the from in a matter of

3    minutes before the interview began?

4    A    I could have, yes.

5    Q    But you chose not to?

6    A    No, because I chose to advise him of his rights on the

7    card.

8    Q    My question is you knew you had the form in the car,

9    you chose not to get it when the interview began?

10   A    Correct.

11   Q    Now when Mr. Lacy was given the advice of rights form

12   after the questioning was complete, was he given other

13   documents at the same time?

14   A    I can't recall.

15   Q    You testified previously that at least the warrant for

16   arrest was given in the same general period?

17   A    Afterwards, yes.

18   Q    But in the same time period.

19        What about any documents related with the search

20   itself, either a receipt of an inventory of items taken?

21   A    I believe they were provided to him, but it wasn't by

22   me.

23   Q    It wasn't by you?

24   A    No.

25   Q    Do you know if those were provided at the same time of

1   the advice of rights form?

2   A    I don't know that.

3   Q    Now as you sit here today, do you know what time the

4   advice of rights form was signed by Mr. Lacy?

5   A    It was at the conclusion of the interview.

6   Q    I'm just saying, do you know what time of day the

7   advice of rights form was signed by Mr. Lacy?

8   A    About midmorning.

9   Q    Can you put that into a numerical value?

10  A    Ten o'clock, 10:30.

11  Q    Now you previously testified -- and if I can direct

12  your attention to Government's Exhibit 2, that is the

13  consent to search form.  Do you have that in front of you?

14  A    Yes, I do.

15  Q    You testified previously that you saw Mr. Lacy execute

16  this document; is that correct?

17  A    Correct.

18  Q    And that you saw him initial above the time, which is

19  8:08 a.m.; is that correct?

20  A    Correct.

21  Q    So he not only signed that document, he also initialed

22  the time that was provided to him, correct?

23  A    Correct.

24  Q    But on the advice of rights form, no time is provided;

25  is that correct?

1   A    That's correct.

2   Q    Did Mr. Lacy ask you to put a time on that form?

3   A    No.

4   Q    Are you certain?

5   A    Yes.

6           MR. LEWIS:  I have no further questions, Your

7   Honor.

8           THE COURT:  Ms. Christensen, do you have any more?

9           MS. CHRISTENSEN:  Nothing further, Your Honor.

10          THE COURT:  May this witness be excused?

11          MR. LEWIS:  Yes, Your Honor.

12          THE COURT:  Ranger, that means you do not need to

13  worry about being re-called, but I would ask you not to

14  discuss your testimony with any other witness or in the

15  presence of any other witness, all right?

16          THE WITNESS:  Yes, Your Honor.

17          THE COURT:  Thank you.

18          Any other witnesses, Mr. McKelvie?

19          MR. McKELVIE:  None from the government, Your

20  Honor.

21          THE COURT:  Mr. Lewis.

22          MR. LEWIS:  Yes, Your Honor.  As I mentioned, we

23  have three, Mr. Lacy, his daughter Tyrel Saunders, and his

24  son, also named David Lacy.

25          THE COURT:  Let's go ahead and call your first

1   witness then.

2          MR. LEWIS:  I want to raise one issue with the

3   Court.  That is his daughter has a young baby at home, so

4   she's going to appear, and I just would ask if we could

5   accommodate her.  She may show up, she has a limited window

6   of time when she could be here, so I ask if someone else is

7   testifying, we may request that we put her on and interrupt.

8          THE COURT:  That will be fine.

9          MR. LEWIS:  Your Honor, we would call David Lacy.

10                   DAVID LACY,

11          Having been duly sworn, was examined

12                and testified as follows:

13          THE CLERK:  If you would state and spell your name

14   for the Court.

15          THE WITNESS:  My name is David A. Lacy.  L-a-c-y.

16          THE COURT:  Go ahead.

17          MR. LEWIS:  Thank you.

18                   DIRECT EXAMINATION

19   BY MR. LEWIS:

20   Q   Mr. Lacy, I want to turn immediately to the events of

21   June 10th, 2009.  Do you recall the events of that date?

22   A   I do.

23   Q   I would like to try to proceed in a chronological

24   order.  Can you tell me how you were awakened on that day?

25   A    I had previously gotten up and went in onto the couch

1    in the front room and had fallen asleep as I was watching

2    TV, heard a loud banging on our outside door.

3    Q    When you say you were sleeping in the front room, is

4    that in the basement?

5    A    It's down in the basement, yes.

6    Q    You were at the time remodeling your house?

7    A    Yes.

8    Q    And is it fair to say the basement was the primary

9    habitable area of the house?

10   A    It's the primary, yes.

11   Q    So you heard pounding at the door, and anything else

12   being said?

13   A    It said, open up, police.  And I thought it was my son,

14   who is a deputy sheriff, the gentleman looked about the same

15   height of my son, and I told him to knock it off.

16   Q    And I assume he didn't oblige?

17   A    No.

18   Q    What time approximately was this, do you know?

19   A    Between 6:30, 6:45, somewhere around in there I

20   thought.

21   Q    And so when you arrived at the door, can you describe

22   what you saw?

23   A    When I arrived at the door, the officer that had been

24   pounding on the door had his weapon drawn.  There were other

25   agents to both sides of the door and another one out in

1    front.  When I say both sides, they was -- I have a wind

2    wall that is from the walkout basement, and they was

3    stationed right there with their guns drawn.

4    Q    So how many agents could you see at that time?

5    A    I could see six.

6    Q    And they all had their guns drawn?

7    A    Yes.

8    Q    Do you remember what types of weapons?

9    A    I know that one had a rifle.  It might have been a

10   shotgun.  The rest had pistols.

11   Q    Then did the agents say anything to you when you

12   approached the door?

13   A    Just that they were police and that they was executing

14   a search warrant.

15   Q    Did they mention what the search warrant was for?

16   A    When they took me outside, I asked them, you know, what

17   the search warrant was for.

18   Q    What did they respond?

19   A    They told me for archeological artifacts.

20   Q    Did they ask you at that point if you had any weapons

21   in the house?

22   A    They did.

23   Q    What did you respond?

24   A    I told them yes.

25   Q    Do you know if the officers ever attempted to secure

1   those weapons?

2   A    I don't think that they did.

3   Q    Were you ever informed at that point that the officers

4   also had a warrant for your arrest?

5   A    No, sir.

6   Q    When you were informed they had the search warrant and

7   they were looking for artifacts, how did you respond?

8   A    I told them that I could take them right to the

9   artifacts.

10  Q    Did you discuss at that time whether you would be

11  willing to discuss the issues with them or speak with them?

12  A    No, sir.

13  Q    Did you tell them that you would tell them everything

14  they wanted to know?

15  A    No, sir.

16  Q    Was there any discussion at that point whether they

17  intended to ask you questions and, if so, whether you would

18  consent to that interview?

19  A    No.  All they was looking for was any archeological

20  artifacts that I had.

21  Q    And so what happened next?

22  A    Well, I went in and they allowed me to get dressed.  I

23  threw on some short pants and a T-shirt, and I had some

24  flip-flops that I put on.

25  Q    Were you accompanied by an agent --

1    A    Yes.

2    Q    -- while that happened?

3    A    Yes.

4    Q    Then what happened?

5    A    Then I proceeded to go upstairs and took them into the

6    bedroom that contained those artifacts.

7    Q    That's on the upstairs floor?

8    A    Yes, it's the top floor.

9    Q    So there's a basement, main floor, and top --

10   A    Upstairs, yes.

11   Q    When you got to that room, what happened?

12   A    I went in there and showed them the artifacts, said

13   that there was some boxes that had artifacts in them.

14   Q    When you say you showed them, how many -- who are you

15   referring to?

16   A    There was the two agents that followed me up.

17   Q    Do you know if those agents have been present in the

18   court today, Ranger Caffey or Ranger Kotlowski?

19   A    Yes.

20   Q    At some point did additional agents show up in the

21   room?

22   A    Yes, there was.

23   Q    How many, do you know?

24   A    You know, at that time there was probably two other

25   agents that had made their way on upstairs.

1   Q   After you had shown the artifacts, did there come a

2   time when they asked if you would be willing to speak with

3   them?

4   A   Yes.

5   Q   Go ahead.

6   A   They asked if there is a place we could speak.  And I

7   said, yeah, we could go downstairs.  They said, no, that

8   they would like a more private place.  I pointed to the

9   master bedroom and says we could go in there.

10   Q   And so was that room equipped -- I know you are in the

11   process of remodeling, was it equipped for an interview at

12   that point?

13   A   No.

14   Q   So what happened?

15   A   We went back downstairs and got three chairs and went

16   back upstairs.

17   Q   Mr. Lacy, I'm going to show what has been marked as

18   Exhibit E and ask if you can identify what that is?

19   A   That's in the master bedroom.

20   Q   Is that the picture --

21   A   Two chairs.

22   Q   -- from the hallway looking into the master bedroom?

23   A   Yes.

24   Q   Is that an accurate depiction of how the room -- of the

25   condition of the room on June 9th, 2009 -- June 10th, 2009?

1   A    Yes.  The chairs have never been moved when this

2   picture was taken.  It was right where they were.

3            MR. LEWIS:  Your Honor, I would like to move the

4   admission of Exhibit E.

5            MR. McKELVIE:  No objection.

6            THE COURT:  It will be admitted.

7            (Defendant's Exhibit E was received into

8   evidence.)

9            THE COURT:  Who took the photograph, Mr. Lacy?

10           THE WITNESS:  My investigator.

11  BY MR. LEWIS:

12  Q    So, Mr. Lacy, directing your attention to Exhibit E,

13  those two chairs are essentially in the same place where

14  they were on June 10th, 2009?

15  A    Yes, they are.

16  Q    Those would have been the chairs where the agents were

17  sitting?

18  A    Yes, it was.

19  Q    And then you were sitting on a third chair?

20  A    Yes.

21  Q    Where would that have been located?

22  A    That would have been in back.  The door would be hiding

23  that chair.

24  Q    At what time did you accompany the agents into this

25  room?

1   A    That is approximately eight o'clock -- or seven clock,

2   excuse me.

3   Q    So 15 minutes to a half an hour after --

4   A    Exactly.

5   Q    -- they arrived?

6        At some point during the interview did you ask if you

7   could use the restroom?

8   A    You know, I can't remember.  I remember the only time

9   that I used the restroom was when we went down and got the

10  chairs, and that was the time that I can remember using the

11  restroom.

12  Q    When you used the restroom, were you asked to keep the

13  door open?

14  A    I started closing it and the agent says, no, you need

15  to leave it open.

16  Q    And did an agent remain stationed outside that open

17  door?

18  A    Yes, they did.

19  Q    Let me show you a second picture, which we'll mark as

20  Exhibit F.  Can you tell me what that picture represents?

21  A    That picture is looking from the master bedroom to the

22  doorway of the room where the artifacts are.

23  Q    And is that an accurate depiction of the hallway

24  outside the room where you were questioned on the date in

25  question?

1    A    Yes.

2         MR. LEWIS:  Your Honor, I would like to move the

3    admission of Exhibit F.

4         MR. McKELVIE:  No objection, Your Honor.

5         THE COURT:  It will be admitted.

6         (Defendant's Exhibit F was received into

7    evidence.)

8    BY MR. LEWIS:

9    Q    As you were being questioned on that date, was the door

10   leading into or out of the master bedroom open or closed?

11   A    It was closed.

12   Q    At some point was the door opened?

13   A    Yes.  There was one time when an officer came in.  He

14   knocked, came in -- or an agent came in and asked if they

15   could search the outbuilding there, and I says yes.  And

16   then another time they came in and asked if they could

17   search my pickup.

18   Q    Each time that door opened, were you able to look

19   briefly out into the hall?

20   A    Yes, I was.

21   Q    What did you see?

22   A    It appeared to me that there was an agent standing

23   outside the door guarding it.

24   Q    You saw him each time the door opened?

25   A    Each time, the same one.

```
 1   Q    Now before you were questioned, are you familiar with
 2   the term Miranda rights?
 3   A    I am.
 4   Q    Were you given your Miranda rights?
 5   A    No, sir.
 6   Q    Were you advised that you had the right to remain
 7   silent?
 8   A    No, sir.
 9   Q    Were you advised that you had the right to terminate
10   the questioning?
11   A    No, sir.
12   Q    Were you advised that anything you said could be used
13   as evidence against you?
14   A    No, sir.
15   Q    Were you advised that you had a right to a lawyer and
16   if you couldn't afford one, one would be appointed for you?
17   A    Not in those terms.
18   Q    Was there some discussion about an attorney?
19   A    Yes.
20   Q    What was that?
21   A    They said that I could have an attorney.  And I said,
22   well, I thought we was just talking.  They says, yeah, we're
23   just talking.  I said, well, then, I guess I don't need an
24   attorney.  And they said, yeah, that's right.
25   Q    Did they ever advise you before the interview began
```

1    that an arrest warrant had been issued for you?

2    A    No, sir.

3    Q    Did they advice you that charges were already pending

4    against you?

5    A    No, sir.

6    Q    Would have you have spoken with the agents had you

7    known any of these facts?

8    A    No, sir.

9              MR. McKELVIE:  Objection, calls for speculation.

10             THE COURT:  Sustained.

11             MR. McKELVIE:  Move to strike the answer, Your

12   Honor.

13             THE COURT:  Well, since I'm the guy who looks at

14   the transcript and decides, Mr. McKelvie, I think we're

15   okay.

16             MR. McKELVIE:  Judge, I always teach my students

17   to do that, so to be consistent.

18   BY MR. LEWIS:

19   Q    I don't want to go into the tone of the -- or the

20   content of the interview at all, but can you describe the

21   tone of the interview?

22   A    At first it was -- we were just talking as if you and I

23   are talking.  Then as it progressed, they became more

24   adversarial with their questioning.

25   Q    Did they raise their voices?

1    A    A couple of times, yes.

2    Q    Express frustration?

3    A    Once or twice.

4    Q    How long did the questioning last?

5    A    Three to four hours.

6    Q    Do you remember what time in the morning you believe it

7    terminated?

8    A    It was about eleven o'clock that it terminated.

9    Q    Did you get any breaks during this questioning period?

10   A    None.

11   Q    Mr. Lacy, can you look at the consent to search vehicle

12   form there in front of you?

13   A    Yes.

14   Q    Is that your signature on that document?

15   A    As soon as I find it.

16        Yes, it is.

17   Q    Are those your initials above the time?

18   A    Yes, they are.

19   Q    Was the time accurate?

20   A    Yes.

21   Q    Did you ever get to see any family members while you

22   were being questioned?

23   A    No, sir.

24   Q    Were you advised that any family members were

25   attempting to make contact with you that day?

```
 1   A     No, sir.

 2   Q     How did the interview end?

 3   A     When they came back in and told me that they was going

 4   to arrest me.

 5   Q     What happened after you were informed that you would be

 6   arrested?

 7             THE COURT:  What do you mean they came back in?

 8             THE WITNESS:  Well, they had -- well, one of the

 9   officers had left -- or agents had left, came back in and

10   said, you know, we're going to arrest you.

11             THE COURT:  Was this at the end of the interview?

12             THE WITNESS:  That was at the end of the

13   interview, yes.

14   BY MR. LEWIS:

15   Q     Prior to this moment, did you know that there was an

16   existing warrant for your arrest?

17   A     No, sir.

18   Q     Prior to this moment, did you know that you had already

19   been charged with several federal felonies?

20   A     No, sir.

21   Q     Did you have any idea that you would be arrested that

22   day?

23   A     I didn't.

24   Q     What happened after you learned that you would be

25   arrested?
```

1   A    I was kind of distraught.

2   Q    This may sound like an obvious question, but why is

3   that?

4   A    Because I hadn't done anything wrong I didn't feel.

5   Q    You are employed as a school teacher; is that correct?

6   A    Yes, I am.

7   Q    And did you worry about the effect that charges might

8   have --

9   A    I did.  I told them that I would be terminated -- my

10  employment would be terminated.

11  Q    And did you -- at what point -- let me ask, did you

12  ever learn there was a court date, an initial appearance

13  already scheduled for you that day?

14  A    I didn't until we went downstairs.

15  Q    You learned of that in the house --

16  A    I did learn that in the house.

17  Q    -- before you were transported?

18       When you went downstairs, what happened?

19  A    Went downstairs, I asked him if I could go ahead and

20  change into some longer pants.  I didn't know how long I

21  would be.  I went ahead and went into my bedroom and got my

22  medications that I take on a daily basis because I didn't

23  know what was going to happen.  I didn't know if I was going

24  to be, you know, taken straight to jail and be there for a

25  while or what.  And I got those, went to the table, and

1    that's when they started asking me to sign the papers.

2    Q    Let me step back one second.  As you changed your

3    clothes this second time into long pants, again, were you

4    watched by an agent?

5    A    Yes.

6    Q    Okay.  So you indicated that you were given forms to

7    sign.  Do you remember what those forms were?

8    A    There was this form here, the Miranda rights, and --

9    Q    Could you indicate which form you are on?

10   A    It's Government Exhibit 3.

11   Q    Okay.  What other forms, do you know?

12   A    There was the arrest warrant.  There was the -- I think

13   the evidence that they was collecting, forms and stuff, that

14   they had taken at that time.

15   Q    And those were all presented to you at the same time?

16   A    Yes.

17   Q    Now referring to Government's Exhibit 3, is that your

18   signature --

19   A    It is.

20   Q    -- on that document?

21        Were you given any explanation about that document or

22   was it explained to you at the time you signed it?

23   A    They never -- they just handed it to me.  And once I

24   seen it, I says, well, this is my Miranda rights.  And I

25   read it at that time.  That was the first time any mention

1  of it was.

2  Q    Did you mention at that point whether that affected

3  your willingness to --

4  A    Yes.  I said, well, I guess I won't talk to you now.

5  Q    Do you remember -- you'll notice on that document that

6  the time is blank?

7  A    Yes.

8  Q    Do you remember what time you signed the form?

9  A    I do.

10  Q    What time?

11  A    It was at 11:25.

12  Q    How do you remember that?

13  A    Because the only clock I have in my downstairs basement

14  in the kitchen is the clock on the stove, and I always keep

15  it 15 to 20 minutes fast.  It was about 15 minutes fast.

16  And I looked up and told them that they needed to put the

17  time of 11:25.

18  Q    So you asked them to put the time on the form?

19  A    I did.

20  Q    What were you told in response?

21  A    They said that they would.

22  Q    What happened after you signed this and the other

23  forms?

24  A    That's when they went ahead and put me in handcuffs.

25  Q    How many agents did you see at your home on June 10th,

1    2009?

2    A    I thought there was 12, but, you know, there might have

3    only been 11.

4    Q    How many of those were armed, if you noticed?

5    A    I thought all of them except for the archeologist was

6    armed, but, you know, maybe another one wasn't.  I don't

7    know.

8    Q    Did you feel like the police presence was dominating

9    the home?

10   A    It was.

11   Q    Did the two agents that interviewed you, were they

12   armed throughout the interview?

13   A    Yes.

14   Q    Were you able -- were those weapons visible?

15   A    Yes.

16   Q    Did you feel like you could have left your house at any

17   time after the agents arrived?

18   A    No, sir.

19   Q    Why is that?

20   A    Because of the presence that they had with the guns

21   and, you know, always escorting me wherever I was going to

22   go.

23           MR. LEWIS:  Nothing further, Your Honor.

24   //

25   //

```
 1                      CROSS-EXAMINATION
 2   BY MR. McKELVIE:
 3   Q    Good morning, Mr. Lacy.
 4        You indicated to the officers when they first arrived
 5   at your house that your brother was the sheriff?
 6   A    I did.
 7   Q    And, in fact, your brother is the San Juan County
 8   sheriff, correct?
 9   A    He is.
10   Q    Has been for some time?
11   A    Yes.
12   Q    You testified that your son is a deputy sheriff?
13   A    Yes, I did.
14   Q    And how long has he been a deputy sheriff?
15   A    He's been a deputy sheriff approximately three to four
16   years.
17   Q    Also in San Juan County?
18   A    Yes.
19   Q    Your father was the sheriff of San Juan County,
20   correct?
21   A    Yes, for eight years.
22   Q    Before that was he a law enforcement?
23   A    He was a highway patrolman for 27 years.
24   Q    Have you ever been a sworn police officer?
25   A    No, sir.
```

1   Q    Have you ever worked as a reserve for the sheriff's

2   office or Blanding P.D.?

3   A    Nope.

4   Q    You spent most of your life around a number of police

5   officers?

6   A    I did.

7   Q    And you are aware of the weapons that they carry and

8   the uniforms that they wear?

9   A    Yes, I am.

10   Q    There was nothing unusual about the weapons or the

11   uniforms that you encountered at your home on June 10th?

12   A    Other than they were drawn.

13   Q    They were drawn only until you answered the door and

14   the home was secured, then they were put away; is that

15   correct?

16   A    No, sir.  There were still weapons out -- there was

17   still one officer that had his weapon out until we went

18   upstairs.

19   Q    At the time you went upstairs, neither of the

20   interviewing rangers had their weapons unholstered at any

21   time?

22   A    No, sir.

23   Q    They never used those weapons in any threatening

24   manner, did they?

25   A    No, sir.

1   Q    As uniform law enforcement officers, you would expect

2   them to have those firearms on their presence at all times?

3   A    Yes, sir.

4   Q    Now you indicated that you were always escorted through

5   the house by at least one officer, when you went to the

6   bathroom, when you went to change your clothes, correct?

7   A    Yes, sir.

8   Q    You also indicated that at the outset they asked you if

9   there were any firearms in the home.  You told them there

10  were?

11  A    There were.

12  Q    You indicated they made no effort, that you were aware

13  of, to secure any of those firearms?

14  A    As far as I was aware, no.

15  Q    So as far as you know at the times that you were being

16  escorted by an officer, those firearms were unsecured?

17  A    As far as I know.

18  Q    Now when the officers initially confronted you, they

19  indicated to you that their purpose was to execute a search

20  warrant on your home, correct?

21  A    That's correct.

22  Q    They indicated to you the general nature of the crimes

23  they were investigating?

24  A    Archeological artifacts that were contained in my home.

25  Q    You knew they were federal agents?

1  A    Yes.

2  Q    And you were anxious to assist them in identifying any

3  artifacts that were in your house?

4  A    I felt it would be easier if I showed them than having

5  them tear up my house looking for them.

6  Q    In fact, you thought that you could convince them that

7  the artifacts that you had in your possession had been

8  obtained legally, correct?

9  A    Those artifacts, yes.

10  Q    And, in fact, you made some effort during the course of

11  this entire interview to convince the investigating agents

12  that the artifacts that you had were not obtained in

13  violation of any federal law?

14  A    Yes.

15  Q    That was your intention at the outset when they first

16  indicated to you that they were searching for artifacts?

17  A    It's because they were legal.

18  Q    So in your mind you had done nothing wrong?

19  A    I had done nothing wrong.

20  Q    You wanted to explain that to these agents when they

21  were there with the search warrant?

22  A    In essence, yes.

23  Q    You not only voluntarily took them to the room where

24  you had these artifacts, you actually offered to take them

25  to the room?

1   A    Yes, I did.

2   Q    In other words, it wasn't in response to their inquiry,

3   they didn't say, Mr. Lacy, where do you have your artifacts,

4   you volunteered that at the outset?

5   A    I told them I would take them right to where they

6   needed to go.

7   Q    You did that?

8   A    I did.

9   Q    At that time they didn't ask you any questions about

10  where those artifacts came from or what their origin was?

11  A    No, sir.

12  Q    You showed them artifacts at that time?

13  A    I did.

14  Q    You told them where the artifacts had come from?

15  A    Yes, I did.

16  Q    That process took about ten or 15 minutes?

17  A    Yes.

18  Q    At that time one of these rangers asked if there was a

19  place that you could talk privately?

20  A    Yes.

21  Q    Did you ask them at any time what they wanted to talk

22  about?

23  A    No, I didn't.

24  Q    You indicated that there was a place that you could

25  talk privately?

```
 1   A    I had asked them if we could go downstairs because

 2   there was chairs downstairs and they didn't seem to want to

 3   go downstairs.

 4   Q    Eventually you ended up in this room that you have

 5   identified in these photographs, and the three of you sat

 6   down and had a conversation?

 7   A    Yes.

 8   Q    Now you indicated in response to Mr. Lewis's questions

 9   that no Miranda rights were given you?

10   A    Yes.

11   Q    You are very familiar with the Miranda rights?

12   A    Yes, I am.

13   Q    You've been around law enforcement all your life,

14   correct?

15   A    Seen it on TV.

16   Q    Seen it on TV, just the way that we all do.

17        Did you ask them at any time about the Miranda rights?

18   A    I didn't.

19   Q    But you did indicate at some time there was a

20   conversation about a lawyer?

21   A    I did.

22   Q    And they brought that up?

23   A    They brought it up.

24   Q    So they did talk to you about some -- you acknowledge

25   that at the outset of this conversation they brought up some
```

1   of the rights that we refer to as Miranda rights?

2   A    They asked me some questions beforehand and then they

3   asked -- you know, said something about a lawyer.

4   Q    But this wasn't in response to a question by you?

5   A    No.

6   Q    You didn't say, maybe I ought to have a lawyer, do you

7   think I ought to have a lawyer?

8   A    No.

9   Q    First time the topic of a lawyer came up was brought up

10  by the rangers?

11  A    Yes.

12  Q    This entire conversation that you had with them was

13  voluntary on your part?

14  A    Yes.

15  Q    You never at any time asked them to terminate the

16  conversation?

17  A    I didn't know I had that right.

18  Q    Please just answer my question.  You at no time asked

19  them if you could terminate the conversation?

20  A    No.

21  Q    At no time did they refuse a break that you asked for?

22  A    I never asked for a break.

23  Q    So having never asked for one, they never had an

24  opportunity to refuse?

25  A    No, sir.

1    Q    You indicated that this conversation took place for

2    over a period of approximately three to four hours?

3    A    Exactly.

4    Q    But you also acknowledge there was no clock in the

5    room?

6    A    No.

7    Q    In fact, the only functioning clock that you are aware

8    of is in the kitchen?

9    A    Was downstairs, when we went downstairs, yes.

10   Q    It's not set at an accurate time?

11   A    It's not, but--

12   Q    You are aware of the time it's set?

13   A    I'm aware of time it's set, but I was always aware of a

14   watch that was on Mr. Kotlowski's wrist that said

15   eleven o'clock.

16   Q    Was that a digital watch or a dial watch?

17   A    It was a dial watch.

18   Q    You were able to read that from your vantage point?

19   A    We was right close, yes.

20   Q    And did it say eleven o'clock at the termination of the

21   interview?

22   A    That's when they came in and told me they was going to

23   arrest me.

24   Q    At some point during the course of the conversation you

25   were asked about the outbuildings on your property --

1  A    Yes.

2  Q    -- and whether they could be searched, correct?

3  A    Yes.

4  Q    At that time you told the agents that they could search

5  the outbuilding?

6  A    Yes, I did.

7  Q    You told them that the keys to the outbuilding may be

8  in your truck?

9  A    No.  That was to the storage facility that's located

10 down in Blanding.

11 Q    They asked you about that as well?

12 A    Yes, but there is no locks on the other doors.

13 Q    You gave them consent to search the storage building in

14 Blanding?

15 A    Yes.

16 Q    And you told them that the keys were in the truck?

17 A    Yes.

18 Q    At that time they asked you for consent to search the

19 truck to obtain those keys?

20 A    They did.

21 Q    And they asked you to sign a consent form for that

22 search?

23 A    Yes.

24 Q    That was done at the time they asked for permission to

25 search the truck?

1    A    At 8:08.

2    Q    And you know that time because it's written on that --

3    A    Written on that.

4    Q    You didn't make an independent note of the time?

5    A    I didn't.

6    Q    So that was sometime during the course of the

7    interview?

8    A    Yes.

9    Q    At that time Ranger Kotlowski left the room for a short

10   period of time?

11   A    I believe he did.

12   Q    You heard him testify today with respect to that?

13   A    Yes.

14   Q    With respect to that specifically, you don't have any

15   issue with his testimony?

16   A    I don't.

17   Q    At that time did Ranger Caffey remain in the room with

18   you?

19   A    Yes.

20   Q    Did he continue his interview during that period of

21   time?

22   A    Yes.

23   Q    Now during the course of this interview, you spoke

24   about a wide range of different archeological artifacts with

25   these rangers, correct?

1   A    Yes.

2   Q    Including origin, when and how you had obtained them,

3   correct?

4   A    Yes.

5   Q    You talked about selling some artifacts?

6   A    Yes.

7   Q    And during that period of time you did not ask to

8   terminate the interview?

9        MR. LEWIS:  Your Honor, I would just like to raise

10  an objection.  To the extent we're going to the merits of

11  this, I believe it's beyond the scope.  We've not -- under

12  clear precedence, we're entitled to have him testify on the

13  suppression issues without waiving any Fifth Amendment

14  privilege.  I think, as we get into the substance, they are

15  crossing that line.

16       MR. McKELVIE:  Your Honor, just so you know, I

17  have no intention of going into any detail about this.  I

18  just wanted to establish the fact that what they were

19  talking about was, indeed, something that he would have been

20  aware of, that they were making inquiry into areas of

21  violations of law.  And I think that point has been

22  established and I will go on.

23       THE COURT:  Mr. Lacy, first of all, I will

24  overrule the objection based upon Mr. McKelvie's

25  representation of how narrow will be his questioning.  If

1   you believe he goes beyond that, Mr. Lewis, I would

2   encourage you to object specifically.

3          Mr. Lacy, I do need to inform you that by your

4   testifying here today, you do not in any way waive your

5   right to testify in the future.  But you do need to

6   understand that anything you may say in the course of this

7   hearing, if you do testify at a trial, could be used to

8   impeach you at that time if Mr. McKelvie believes there is

9   something about this testimony that would be inconsistent

10  with what you may say at trial.  Again, you do not waive

11  your Fifth Amendment right at any time.  Do you understand

12  that?

13          THE WITNESS:  Yes.

14          THE COURT:  You hesitate.  Do you have a question?

15          THE WITNESS:  Well, you mean I can take the Fifth?

16          THE COURT:  Anytime you want to.

17          THE WITNESS:  Okay.

18          THE COURT:  But more importantly is the point that

19  because you testified here does not mean that you would then

20  be required to testify at a trial.

21          THE WITNESS:  Okay.

22          THE COURT:  All right.  You understand that?

23          THE WITNESS:  I do.

24          THE COURT:  All right.

25  //

1    BY MR. McKELVIE:

2    Q    Mr. Lacy, at some time you signed that consent to

3    search form, correct?

4    A    I did.

5    Q    You also signed that Miranda waiver of rights form,

6    correct?

7    A    I did.

8    Q    You indicated that the photographs, Exhibits E and F I

9    believe they are marked, were taken by your investigator.

10   What is your investigator's name?

11   A    Jeff Neilson.

12   Q    Now when you awakened at 6:00, 6:30 in the morning on

13   June 10th, that was a regular day for you as far as you

14   knew, correct?

15   A    Yes.

16   Q    Were you employed during that period of time?

17   A    I'm not.

18   Q    You are a school teacher, correct?

19   A    I am.

20   Q    This is a period of time when school was not in

21   session?

22   A    Yes.

23   Q    And did you have any particular plans for that day?

24   A    I was going to go golfing.

25   Q    In any event, you didn't plan on being arrested that

1   morning?

2   A   No, I didn't.

3   Q   And you didn't plan on having several armed officers

4   intrude in your house to engage in a search warrant and

5   question you?

6   A   No, sir.

7   Q   As is fair to characterize your affect at that time as

8   somewhat surprised and confused?

9   A   I was surprised.

10   Q   And did it seem like there were a lot of things going

11   on all of a sudden?

12   A   Yes.

13   Q   Things that you didn't even begin to have contemplated

14   or predicted?

15   A   Yes.

16   Q   And is it fair to characterize that that confusion was

17   somewhat enhanced by the potential fear of some kind of

18   criminal prosecution or criminal wrongdoing?

19   A   No.

20   Q   You were certainly aware that the officers were

21   investigating criminal activity?

22   A   I was.

23   Q   And even though you testified that you had no personal

24   feeling that you had violated the law, you certainly weren't

25   under the impression that they shared that belief?

1    A    They had came in to execute a search warrant.

2    Q    I guess what I'm getting at is that you must have felt

3    a certain degree of apprehension during this period of time?

4    A    Oh, yes.

5    Q    A lot of things going through your head at once?

6    A    Yes.

7    Q    Things involving the nature of the investigation, the

8    number of people in your house, things of that nature?

9    A    Yes.

10   Q    And all of this occurred over a relatively short period

11   of time?

12   A    Very quick time.

13         MR. McKELVIE:  May I have just a moment, Your

14   Honor?

15         THE COURT:  You may.

16         MR. McKELVIE:  That's all I have, Your Honor.

17         THE COURT:  Mr. Lewis.

18                    REDIRECT EXAMINATION

19   BY MR. LEWIS:

20   Q    Mr. Lacy, Mr. McKelvie made reference to the fact there

21   was no clock in the room.  Can you just tell the Court how

22   you know approximately when the interview began?

23   A    When the interview began was approximately five, ten

24   minutes after we went upstairs, and that would have been

25   close to seven o'clock.

1   Q    Then after the interview was terminated, were you taken

2   back downstairs?

3   A    I was taken back downstairs.

4   Q    You were able to see the clock?

5   A    That's when I was able to see the clock.

6   Q    Now you testified on cross-examination at some point

7   the agents raised this issue you might be entitled to a

8   lawyer?

9   A    Yes.

10   Q    And what was your response?

11   A    I asked him if we was just talking, and they said yes.

12   Q    And did you state whether you thought you might need a

13   lawyer?

14   A    I says, if we're just talking, I shouldn't need a

15   lawyer.

16   Q    What was their response?

17   A    They said, yes, that's right.

18   Q    And as you sat there, did you know that you had the

19   right to terminate the interview?

20   A    I didn't.

21   Q    Did you know you had the right to remain silent?

22   A    I didn't.

23   Q    Did you know that a lawyer would be paid -- hired for

24   you if you couldn't afford one?

25   A    I didn't have that told to me.

1   Q    You didn't know that you had already been charged --

2   A    No, sir.

3   Q    -- with a crime?

4       Is it fair to say your understanding is they were just

5   there looking for artifacts on that day?

6   A    I thought that's all they was there for.

7           MR. LEWIS:  I have nothing further, Your Honor.

8           THE COURT:  Mr. McKelvie?

9           MR. McKELVIE:  No recross, Your Honor.

10          THE COURT:  All right.  Thank you.

11          Mr. Lacy, you may step down.

12          Mr. Lewis, would you like to call your next

13  witness, please.

14          MR. LEWIS:  Yes, Your Honor.  She's out in the

15  hall here.

16          Your Honor, she's right out in the hallway.  Could

17  I maybe ask what the Court has in mind as far as schedule?

18  I think both of these witnesses are going to be fairly

19  short.

20          THE COURT:  My intention is to keep going and get

21  it done.

22          MR. LEWIS:  We have that one scheduling issue with

23  his daughter, so we'll get her here.

24          THE COURT:  All right.

25   //

```
 1                       TYREL LACY SAUNDERS,
 2               Having been duly sworn, was examined
 3                   and testified as follows:
 4               THE CLERK:  If you would please state and spell
 5     your name for the Court.
 6               THE WITNESS:  My name is Tyrel Lacy Saunders.
 7     T-y-r-e-l, L-a-c-y, S-a-u-n-d-e-r-s.
 8                       DIRECT EXAMINATION
 9     BY MR. CANNON:
10     Q    Good afternoon.  What is your relationship to the
11     defendant, David Lacy?
12     A    I'm his daughter.
13     Q    Were you in Blanding on June 10th, 2009?
14     A    Yes.
15     Q    Where were you in Blanding?
16     A    I was at my mother's house, which is about two miles
17     south of my dad's house.
18     Q    And on that day did you become aware of an event that
19     was happening up at your dad's house?
20     A    Yes.  A family friend told me that something was
21     happening at my dad's house.
22     Q    How did that happen?
23     A    He came to our house.  I was there with my two kids.
24     He said that that he had heard that my dad's name was on a
25     list, that the FBI was investigating him.  So I found -- he
```

```
 1   stayed there with my kids as well as my mom and I went up to

 2   his house to see if anything was going on or what I could

 3   do.

 4   Q    What did you see as you approached the house?

 5   A    His house is on a hill, and I saw two vehicles on the

 6   hill that I knew were not his.  I figured they were probably

 7   the FBI agents'.  And then I saw two vehicles that were not

 8   his at his house too.  And when I drove up and there was an

 9   FBI agent that tried to flag me down, I just kept going.  We

10   saw -- let's see.  He was the only one I saw.  I pulled up

11   closer to my father's house and I tried to go inside his

12   house.

13   Q    So just to clarify, you parked your car and then

14   attempted to enter the residence?

15   A    Yes.

16   Q    What happened at that point?

17   A    The officer from the hill came up and told me not to go

18   in as well as two officers from -- I believe it's two

19   officers from the base of the hill that came up the hill and

20   told me not to go in.

21        THE COURT:  Ms. Saunders, approximately what time

22   of day was this?

23        THE WITNESS:  Sorry.  It was -- 8:35 was about the

24   time I came to -- was the time Fleming, the man who came to

25   my house, then I went up there soon after that, within five
```

1   minutes, so about 8:40.

2   BY MR. LEWIS:

3   Q    What, if anything, did the officers say to you at that

4   point?

5   A    They had asked me to not go in.  They had put their

6   hands on their holster of their guns.  And I had the door

7   open a little bit.  Then I shut the door and asked them to

8   remove their hands from their gun because I was not armed or

9   anything.

10   Q    Which door was open at this point?

11   A    It was the side door that led to the middle floor.

12   Q    Would that be the more traditional entrance should the

13   house have been finished?

14   A    It's not really the main entrance, no, not the main

15   door.  But it's just off to the side -- it's on the same

16   side, but just kind of over to the -- I don't know, the east

17   side I guess.

18   Q    And what did the officers do when you requested that

19   they take their hands off their --

20   A    After I shut the door, they took their hands off their

21   guns.

22   Q    What, if anything, did you say to the officers?

23   A    I asked them what was going on.  They explained to me

24   that he was trafficking pottery and that he was under

25   investigation at that time and I couldn't go in the house.

1   Q    What did you say in response to that?

2   A    I asked if he was being cooperative and if I could see

3   him, or if he could come out and see me.  They told me he

4   couldn't -- I couldn't go in at all and talk to him and he

5   couldn't come out and see me.

6   Q    And how many officers were there during this

7   conversation?

8   A    I believe three of them were.

9   Q    Did all three officers have weapons?

10  A    I know two of them did, but I can't remember about the

11  third one.  He's kind of big.

12  Q    So after you requested to see your dad and he said that

13  it wasn't possible, what did you say next?

14  A    I believe I told -- we talked about what was going to

15  happen to him, if he was going to -- they told me he was

16  going to be arraigned in Moab.  I asked them if I could find

17  a ride -- or if he was going to be able to have a ride home

18  or if I could have him call me.  I gave them my mother's

19  phone number because I didn't think he would know that.

20  Q    Did you do that, did you provide them with a telephone

21  number?

22  A    I wrote it down on a piece of paper from my car and

23  then gave it to them.

24  Q    That was in response to information that he was going

25  to be arraigned up in Moab and this was to arrange for

1   transportation should he need that?

2   A    Yes.

3   Q    Just to clarify the time on this, how long did that

4   conversation last?

5   A    I probably -- I got there about 8:35, 8:40, and I think

6   I left at about 8:55.

7   Q    Where did you go after?

8   A    I just started to head to my mother's house.

9              MR. CANNON:  No further questions, Your Honor.

10             THE COURT:  Mr. McKelvie?

11             MR. McKELVIE:  No questions, Your Honor.

12             THE COURT:  Thank you.

13             Ms. Saunders, thank you.  You may be excused.

14             THE WITNESS:  Thank you.

15             MR. CANNON:  Just one final witness.

16             THE COURT:  If you would call your next witness,

17  and I don't have to warn this witness not to talk about the

18  case if he's in here.

19                  DAVID LACY,

20           Having been duly sworn, was examined

21               and testified as follows:

22             THE CLERK:  If you would please state and spell

23  your name for the Court.

24             THE WITNESS:  David Ian Lacy.  D-a-v-i-d, I-a-n,

25  L-a-c-y.

```
 1                    DIRECT EXAMINATION

 2  BY MR. CANNON:

 3  Q    Good afternoon, David.  What is your relationship with

 4  the defendant, David Lacy?

 5  A    I'm his son.

 6  Q    And were you in Blanding on June 10th, 2009?

 7  A    Yes, I was.

 8  Q    Where were you in Blanding?

 9  A    I was at my mom's house.

10  Q    Where is your mom's house in relation to your dad's

11  house?

12  A    About two miles away, downtown.

13  Q    At some point on that morning of June 10th, 2009, did

14  you become aware of an incident or an event at your dad's

15  house?

16  A    Yes, I did.

17  Q    How did you become aware of that?

18  A    A family friend called me and told me there was

19  something going on at my dad's house.

20  Q    What did you do in response to that phone call?

21  A    I drove up there to see what was going on.

22  Q    Approximately what time of day was this?

23  A    Around 9:00, 9:15.

24  Q    In the morning?

25  A    In the morning.
```

1   Q    And what happened when you approached your dad's house?

2   A    There was a vehicle stopped halfway up the hill.  They

3   stopped me there and made it so I couldn't go any further.

4   Q    Did they stop you on foot or in the car?

5   A    I was on foot.  I stopped because I seen the car up

6   there, so I couldn't really turn around, so I just stopped

7   my car and ran up there.

8   Q    What happened as you got to the car that was parked --

9   A    I couldn't see nobody around the vehicles, so I just

10  ran past the driver's side of the vehicle.  And by the time

11  I got up there, he jumped out and we kind of ran into each

12  other.  Just kind of ran into each other.

13  Q    What happened after you ran into each other?

14  A    I helped him up, and another agent came down and

15  started talking.  I asked if I could see my dad, and they

16  said no.  Is there any way I can talk to him.  They said,

17  yes, we can have him give you a phone call.

18  Q    Who was it that told you, yes, you could have a phone

19  call?

20  A    Another BLM agent.

21  Q    A BLM agent who had come down from the residence to

22  talk with you?

23  A    Yes.

24  Q    The other agent that was there in the vehicle speaking

25  with you, did he identify himself?

1   A     He was just an FBI agent.  He told me his name, but I

2   can't remember.

3   Q     What happened after the BLM agents told you that you

4   could speak with your dad?

5   A     They went in -- they asked me my phone number.  I said,

6   he knows my phone number.  He can call me.  They went into

7   the house.  And he came back out with two other agents.  The

8   two other agents stayed on the porch.  He then came down and

9   told me that I can't talk to him.

10  Q     What did you say in response to that?

11  A     I said, well, then can I see him.  They said no.  I

12  said, well, can he just come to a window and tell me he's

13  okay.  They said no.

14  Q     And did you discuss anything else with those agents?

15  A     I asked what was going to happen.  They said they were

16  going to take him to an arraignment in Moab.  I asked if

17  they were going to take him up there or do I need to.  They

18  said they were going to.  Are you guys going to bring him

19  back.  They said, no, you will have to provide a ride.  I

20  said, how will I know when he's going to be up there, what

21  time do I need to be up there.  They said, we'll give you a

22  phone call.  They never did.

23  Q     So did you leave a number with them?

24  A     Yes, I did, with the BLM agent.

25  Q     Did you then make any arrangements for transportation

1   for your dad later that day?

2   A    Yes, I went up there.

3   Q    You went up to Moab?

4   A    I went to Moab to pick him up.

5   Q    What time of day was that approximately?

6   A    I left -- probably right after I left my dad's house

7   just to go up there to see what else was going on in the

8   cases.

9   Q    At the time of this conversation with this FBI agent,

10  the BLM agent, what time was that again, approximately?

11  A    Around 9:00, 9:15.

12  Q    Did you see any other agents besides the two agents,

13  the BLM agent, FBI agent, and then the two agents who

14  accompanied the BLM agent out of the residence?

15  A    No, I did not.

16  Q    You saw four.  Of those four agents, were any of them

17  armed?

18  A    They all were.

19  Q    Did you see any vehicles that you didn't recognize

20  there on the premises?

21  A    I saw four vehicles other than my dad's.

22  Q    Were any of those vehicles marked as BLM vehicles?

23  A    The BLM and Forest Service was, but the FBI was not.

24  That was the one that was on the road.

25          MR. CANNON:  I believe that's it, Your Honor.  I

1    have no further questions.

2              THE COURT:  Mr. McKelvie?

3              MR. McKELVIE:  No questions, Your Honor.

4              THE COURT:  Mr. Lacy, thank you.  You may step

5    down and be excused.

6              Do you have any additional witnesses?

7              MR. LEWIS:  We do not, Your Honor.

8              THE COURT:  Mr. McKelvie, do you intend to call

9    any additional witnesses?

10             MR. McKELVIE:  No, Your Honor.  Thank you.

11             THE COURT:  Thank you.

12             If we have a transcript by a week from tomorrow,

13   which would be the 3rd of March, can you get us a memorandum

14   by the 17th, Mr. McKelvie -- well, let's say the 19th,

15   Friday the 19th?

16             MR. McKELVIE:  Yes, Your Honor.

17             THE COURT:  Mr. Lewis, can you get us something by

18   Monday, April 5th?

19             MR. LEWIS:  Absolutely.

20             THE COURT:  All right.  I do not intend to have

21   oral argument on the motion nor do I intend to allow a

22   reply.  But if either of you after briefing the issues feel

23   that reply, in your case, Mr. McKelvie, oral argument on

24   behalf of either of you is necessary, you may request it.

25   Otherwise, the Court will just go ahead and make a decision

1    based on your written memorandums.

2              Is there anything else here today, counsel?

3              MR. McKELVIE:  Does the Court want any affirmative

4    indication that we do not intend to seek a reply or will our

5    silence be accepted?

6              THE COURT:  Your silence will be accepted.

7    Silence is normally the course, I'm sure you know,

8    Mr. McKelvie, so it's unusual for it to be requested.  All

9    right.

10             MR. McKELVIE:  That's fine.  Thanks.

11             THE COURT:  Mr. Lewis, do you have anything else?

12             MR. LEWIS:  Nothing else, Your Honor.

13             THE COURT:  Thank you.

14             We'll be in recess.

15             (Whereupon, the proceeding was concluded.)

16

17

18

19

20

21

22

23

24

25

1

```
1                    C E R T I F I C A T E

2

3

4            I hereby certify that the foregoing matter is

5    transcribed from the stenographic notes taken by me and is a

6    true and accurate transcription of the same.

7

8

9

10

11

12

13

14

15

16   PATTI WALKER, CSR-RPR-CP       DATED:
     Official Court Reporter
17   350 South Main Street, #146
     Salt Lake City, Utah  84101
18   801-364-5440

19

20

21

22

23

24

25
```